# 14-4407

*To Be Argued By*:
PAUL M. MONTELEONI

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 14-4407

➤➤➤

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

—v.—

PREVEZON HOLDINGS LTD., PREVEZON ALEXANDER, LLC, PREVEZON SOHO USA, LLC, PREVEZON SEVEN USA, LLC, PREVEZON PINE USA, LLC, PREVEZON 1711 USA, LLC, PRE-VEZON 1810 LLC, PREVEZON 2009 USA, LLC, PREVEZON 2011 USA, LLC,

*Defendants-Appellants,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

PAUL M. MONTELEONI,
JUSTIN ANDERSON,
  *Assistant United States Attorneys,
    Of Counsel.*

FERENCOI INVESTMENTS, LTD., KOLEVINS, LTD., Any and All Assets of PREVEZON HOLDINGS, LTD., Any and All Assets of PREVEZON ALEXANDER, LLC, including but not limited to all right, titile and interest in the real property and appurtenances known as ALEXANDER CONDOMINIUM, 250 EAST 49TH STREET, NY NY 10017, UNIT COMM3, and and all funds on deposit in BANK OF AMERICA ACCT #483044568293, held, Any and all assets of PREVEZON SEVEN USA, LLC, including but not limited to all right, titile and interest in the real property and appurtenances known as 127 SEVENTH AVE. AKA 166 WEST 18TH STREET RETAIL UNIT #2, NY NY and any and all funds on deposit in BANK OF AMERICA ACCT#483041746021 held in the name of PREVEZON SEVEN USA L.L.C., THE PREVEZON SEVEN ACCOUNT, Any and All Assets of PREVEZON PINE USA, LLC, including but not limited to all right, titile and interest in the real property and appurtenances known as THE 20 PINE STREET, NY NY 10005, UNIT 2308 (20 PINE STREET, UNIT 2308), Any and all assets of PREVEZON 1711 USA, LLC, including but not limited to all right, title and interest in the real property and appurtenances known as THE 20 PINE STREET CONDOMINIUM, 20 PINE STREET, Any and All Assets of PREVEZON 1810, LLC, Any and all assets of PREVEZON 2009 USA, LLC, including but not limited to all right, title and interest in the real property and appurtenances known as THE 20 PINE STREET, NY NY 10005, UNIT 1816, Any and All Assets of FERENCOI INVESTMENTS, LTD., Any and All assets of KOLEVINS, LTD., and all property traceable thereto., All right, title, and interest in the real property and appurtenances known as THE 20 PINE STREET CONDOMINIUM, 20 PINE STREET, NEW YORK, NEW YORK 10005, UNIT 1816, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 8293 held in the name of PREVEZON ALEXANDER, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 8084 held in the name of PREVEZON SOHO USA, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 6021 held in the name of PREVEZON SEVEN USA, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 8349 held in the name of PREVEZON 1711 USA, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 9102 held in the name of PREVEZON 2009 USA, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 8242 held in the name of PREVEZON PINE USA, LLC, Any and all funds on

deposit in BANK OF AMERICA ACCOUNT NUMBER 5882 held in the name of PREVEZON 2011 USA, LLC, Any and all funds on deposit in BANK OF AMERICA ACCOUNT NUMBER 9128 held in the name of PREVEZON 1810 USA, LLC, APPROXIMATELY $1,379,518.90 held by the United States as a substitute res for all right, title and interest in the real property and appurtenances known as THE 20 PINE STREET CONDOMINIUM, 20 PINE, APPROXIMATELY $4,429,019.44 held by the United States as a substitute res for all right, title and interest in the real property and appurtenances known as ALEXANDER CONDOMINIUM, 250 EAST 49TH STREET, APPROXIMATELY $1,046,530.04 held by the United States as a substitute res for all right, title and interest in the real property and appurtenances known as THE 20 PINE STREET CONDOMINIUM, 20 PINE, APPROXIMATELY $894,026.21 held by the United States as a substitute res for all right, title and interest in the real property and appurtenances known as THE 20 PINE STREET CONDOMINIUM, 20 PINE S, A DEBT OF 3,068,946 EUROS OWED BY AFI EUROPE N.V. TO PREVEZON HOLDINGS restrained by the Government of the Netherlands on or about January 22, 2014, and all property traceable thereto,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The $230 Million Tax Fraud Scheme . . . . .  3

    B.  Prevezon's Laundering the Proceeds of
        the Tax Fraud Scheme . . . . . . . . . . . . . . . . .  5

    C.  The Complaint and Protective Order . . . .  10

    D.  The Deposition and Further Motions . . . .  11

    E.  The Amended Complaint and Prevezon's
        Motion to Dismiss. . . . . . . . . . . . . . . . . . . .  13

ARGUMENT:

POINT I—This Court Lacks Jurisdiction To Hear
    This Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  15

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  17

POINT II—Prevezon's Challenges to the Amended
    Complaint Should Be Addressed by the District
    Court in the First Instance. . . . . . . . . . . . . . . .  21

POINT III—The Amended Complaint States a
    Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  24

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  27

1. The Amended Complaint Does Not Allege an Extraterritorial Violation of U.S. Law . . . . . . . . . . . . . . . . . . . . . . 27

2. The Amended Complaint Alleges that the Defendants Received Fraud Proceeds . . . . . . . . . . . . . . . . . . . . . . . 32

3. The Amended Complaint Alleges that Prevezon Purchased Manhattan Real Estate with Fraud Proceeds . . . . . . . . 37

4. The Amended Complaint Alleges a Culpable Mental State. . . . . . . . . . . . . 39

5. The Amended Complaint Alleges a Substantial Connection Between the Properties and Money Laundering . . . 44

POINT IV—The Amended Complaint is Properly Verified. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 45

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES

*Cases*:

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 25

*AstenJohnson, Inc.* v. *Columbia Cas. Co.*,
  562 F.3d 213 (3d Cir. 2009) . . . . . . . . . . . . . . . . 50

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007). . . . . . . . . . . . . . . . . 25, 26, 35

*Borey* v. *National Union Fire Ins. Co.*,
  934 F.2d 30 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 16

*Byrd* v. *Wal-Mart Transp., LLC*,
  No. CV609-014, 2009 WL 3055303
  (S.D. Ga. Sept. 23, 2009) . . . . . . . . . . . . . . . . . . . 50

*Carson* v. *Am. Brands, Inc.*,
  450 U.S. 79 (1981). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Farricielli* v. *Holbrook*,
  215 F.3d 241 (2d Cir. 2000) . . . . . . . . . . . . . . . . 22

*First Internet Bank of Indiana* v. *Lawyers Title Ins. Co.*, No. 07 Civ. 869, 2009 WL 2092782
  (S.D. Ind. July 13, 2009). . . . . . . . . . . . . . . . . . . . 50

*Frontera Res. Azer. Corp.* v. *State Oil Co. of the Azer. Republic*, 582 F.3d 393 (2d Cir. 2009) . . . . . . . . 23

*Fulton* v. *Goord*,
  591 F.3d 37 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 22

*In re 650 Fifth Ave. & Related Props.*,
    777 F. Supp. 2d 529 (S.D.N.Y. 2011) . . . . . . . . . 44

*Korea Shipping Corp.* v. *N.Y. Shipping Assoc.*,
    811 F.2d 124 (2d Cir. 1987) . . . . . . . . . . . . . . . . 16

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) . . . . . . . . . . . . . . . . 28, 30, 31

*N.Y. State Nat'l Org. for Women* v. *Terry*,
    886 F.2d 1339 (2d Cir. 1989) . . . . . . . . . . . . . . . 15

*Pasquantino* v. *United States*,
    544 U.S. 349 (2005) . . . . . . . . . . . . . . . . 29, 30, 31

*Petroleos Mexicanos* v. *SK Engineering &
    Construction Co., Ltd.*,
    572 F. App'x 60 (2d Cir. 2014) . . . . . . . . . . . . . . 31

*Roth* v. *Jennings*,
    489 F.3d 499 (2d Cir. 2007) . . . . . . . . . . . . . . . . 25

*Schonfeld* v. *Hilliard*,
    218 F.3d 164 (2d Cir. 2000) . . . . . . . . . . . . . . . . 22

*United States* v. *$22,010.00 in U.S. Funds*,
    No. 09 Cv. 198 (CAR), 2010 WL 1050410
    (M.D. Ga. Mar. 18, 2010) . . . . . . . . . . . . . . . . . . 46

*United States* v. *$22,173.00 in U.S. Currency*,
    716 F. Supp. 2d 245 (S.D.N.Y. 2010) . . . . . . . . . . 25

*United States* v. *8 Gilcrease Lane, Quincy Fla. 32351*,
    587 F. Supp. 2d 133 (D.D.C. 2008) . . . . . . . . . . 46

*United States* v. *All Assets of Statewide Auto Parts*,
    971 F.2d 896 (2d Cir. 1992) . . . . . . . . . . 16, 18, 20

*United States* v. *All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148 (2d Cir. 1995) . . . . . . . . . . . . 38

*United States* v. *All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56 (E.D.N.Y. 2003) . . . . . . . . . . 33

*United States* v. *Anderson*, 747 F.3d 51 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 42

*United States* v. *Any and All Funds Contained in BancorpSouth Account No. xxxx-581-3*, No. 12 Civ. 735 (SLB), 2013 WL 840042 (N.D. Ala. Mar. 6, 2013) . . . . . . . . . . . . . . . . . . . . 46

*United States* v. *Banco Cafetero Int'l*, 608 F. Supp. 1394 (S.D.N.Y. 1985) . . . . . . . . . . . 45

*United States* v. *Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986) . . . . . . . . . . . . . 32, 36

*United States* v. *Corey*, No. 04 Cr. 349 (EBB), 2006 WL 1281824 (D. Conn. May 9, 2006) . . . . . . . . . . . . . . . . . . 32, 36

*United States* v. *Daccarett*, 6 F.3d 37 (2d Cir. 1993) . . . . . . . . . . . . . . . . . 24, 25

*United States* v. *Nektalov*, 461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 40

*United States* v. *Painting Known & Described as Madonna & Child*, No. 14 Civ 4485, 2015 WL 108416 (S.D.N.Y. Jan. 6, 2015) . . . . . . 26

*United States* v. *Premises & Real Prop. At 4492 S. Livonia Rd.*, 889 F.2d 1258 (2d Cir. 1989) . . . . . 20

*United States* v. *Quintana-Aguayo*, 235 F.3d 682 (1st Cir. 2000) . . . . . . . . . . . . . . . . . 17

*United States* v. *Schifferli*, 895 F.2d 987 (4th Cir. 1990) . . . . . . . . . . . . . . . . 45

*United States* v. *Tillman*, 419 F. App'x 110 (2d Cir. 2011) . . . . . . . . . . . . . 42

*United States* v. *Trapilo*, 130 F.3d 547 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 30

*United States* v. *Victoria-21*, 3 F.3d 571 (2d Cir. 1993) . . . . . . . . . . . . 15, 17, 20

*United States* v. *Walsh*, 712 F.3d 119 (2d Cir. 2013) . . . . . . . . . 32, 33, 35

*United States* v. *Zakhary*, 357 F.3d 186 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 48

*Von Hofe* v. *United States*, 492 F.3d 175 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 43

*Walker* v. *Schult*, 717 F.3d 119 (2d Cir. 2013) . . . . . . . . . . 26, 34, 38

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

vii

PAGE

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Fed R. Civ. P. Supp R. G . . . . . . . . . . . . . . . . . *passim*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 14-4407

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

—v.—

PREVEZON HOLDINGS LTD., PREVEZON ALEXANDER,
LLC, PREVEZON SOHO USA, LLC, PREVEZON SEVEN
USA, LLC, PREVEZON PINE USA, LLC, PREVEZON 1711
USA, LLC, PREVEZON 1810 LLC, PREVEZON 2009 USA,
LLC, PREVEZON 2011 USA, LLC,

*Defendants-Appellants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Prevezon Holdings and eight of its corporate subsidiaries ("Prevezon") appeal from an amended asset restraining order and the denial of its motion to vacate a previous restraining order, both entered on November 5, 2014, in the United States District Court for the Southern District of New York, by the Honorable Thomas P. Griesa, United States District Judge.

On September 10, 2013, the Government filed Verified Complaint 13 Civ. 6326 (TPG) (the "Complaint"), seeking the forfeiture of any and all assets of Prevezon and two affiliated companies and the imposition of civil money laundering penalties. The Complaint alleged that the assets at issue were involved in laundering the proceeds of an elaborate tax fraud scheme. The Government also requested a protective order (the "Protective Order") restraining the assets named in the Complaint, which the District Court entered on September 11, 2013.

Prevezon moved to vacate or modify the Protective Order. On January 7, 2014, the District Court denied the motion to vacate but reserved decision on whether to modify the scope of the order.

On November 5, 2014, the Government filed an amended verified complaint (the "Amended Complaint"), narrowing the property subject to forfeiture, and it sought a correspondingly narrowed protective order (the "Amended Protective Order"), which the District Court entered the same day. In light of the amended filings, the District Court denied Prevezon's motion to vacate or modify the original Protective Order.

Prevezon has not challenged the Amended Protective Order in the District Court.

### Statement of Facts

In this action, the Government seeks the forfeiture of property and imposition of civil money laundering penalties on Prevezon for laundering in the United States the proceeds of an elaborate Russian

tax fraud scheme. In 2007 a Russian criminal organization including corrupt Russian government officials (the "Organization") defrauded Russian taxpayers of approximately 5.4 billion rubles, or approximately $230 million, through an elaborate tax refund fraud scheme that involved the use of U.S. wires to pay the perpetrators.[1] After carrying out this fraud, members of the Organization and their associates endeavored to conceal the proceeds of the fraud by engaging in a broad pattern of money laundering that included the purchase of Manhattan real estate using funds that, at a minimum, had been commingled with fraud proceeds.

## A. The $230 Million Tax Fraud Scheme

Members of the Organization stole the corporate identities of three portfolio companies of the Hermitage Fund (the "Hermitage Companies"), a foreign investment fund that invested in Russia in the early 2000s. (A. 1889-91).[2] The members of the Organization used these stolen identities to file fraudulent claims for tax refunds with the Russian government. (A. 1890-91).

---

[1] The facts described in this section are drawn from the Amended Complaint.

[2] "A." refers to the appendix filed with Prevezon's brief on appeal; "Br." refers to Prevezon's brief on appeal; "Docket Entry" refers to an entry in the docket of the District Court; and "Add." refers to the addendum to this brief.

To steal the identities of the Hermitage Companies, members of the Organization caused officers from the Russian Interior Ministry to search the Moscow offices of the Hermitage Fund and its law firm in mid-2007, and to confiscate the original corporate stamps and documents of the Hermitage Companies. (A. 1893-94). Using these items, members of the Organization fraudulently re-registered ownership of the Hermitage Companies away from their rightful owner (a non-US-based HSBC entity as trustee for the Hermitage Fund) into the names of three convicted criminals, using an order from an apparently bogus arbitration court. (A. 1894-95, 1945-46).

With the stolen corporate identities of the Hermitage Companies in hand, members of the Organization forged backdated contracts with fake commercial counterparties, pursuant to which it appeared that the Hermitage Companies owed the counterparties huge sums of money. (A. 1895-97). The counterparties, also controlled by members of the Organization, sued the stolen Hermitage Companies based on the forged contracts. (A. 1897). These lawsuits were sham proceedings in which members of the Organization represented both the counterparties and the Hermitage Companies, orchestrating the proceedings so as to fraudulently procure huge judgments against the Hermitage Companies. (A. 1897-98).

Members of the Organization used the fraudulently procured judgments to apply for tax refunds on behalf of the stolen Hermitage Companies, claiming that these judgments constituted losses negating the profits the companies had made the previous year

and entitling the companies to a refund of the taxes the Hermitage Companies had paid for 2006 (*i.e.*, before the companies were stolen). (A. 1899-1900). Tax officials working for the Organization corruptly approved those refund requests, totaling $230 million, within one business day of the requests, and the full $230 million was paid just two days later. (A. 1900-01). The refunds were paid from the Russian treasury to accounts the Organization had created in the name of the Hermitage Companies. (A. 1901).

### B. Prevezon's Laundering the Proceeds of the Tax Fraud Scheme

After members of the Organization caused the $230 million in tax refunds to be paid, they, directly and through associates, engaged in a series of laundering transactions that dispersed the money to different countries through various shell companies. (A. 1901). Ultimately, a portion of the fraud proceeds —approximately $2 million—was transferred through intermediaries to Prevezon, which commingled those fraud proceeds with other funds and laundered them in the purchase of Manhattan real estate.[3]

---

[3] Members of the Organization also retaliated against those who uncovered the fraud scheme, culminating in the arrest of Sergei Magnitsky, a lawyer who exposed the scheme, and his death in detention. (A. 1903-05). Although these retaliatory actions are relevant, inter alia, to the proportionality of any forfeiture, *see infra* note 24, the Amended Complaint

The flow of fraud proceeds began with a $230 million transfer from the Russian treasury to accounts in the name of the Hermitage Companies at two very small Russian banks. (A. 1909-10). The accounts had been opened by members of the Organization just days before the refund payments were made (A. 1910) and were closed less than two months later, after the money had been transferred to other accounts (A. 1913).

From those bank accounts, the stolen funds were transferred to a number of other accounts held by shell companies. While the Amended Complaint does not purport to "trace" each dollar of the $230 million as it left the bank accounts, it does describe large transfers of funds out of the accounts and follows those funds as they pass through several layers of shell companies. (A. 1911 (shell company named ZhK), 1911-12 (shell company named Fausta), 1912-13 (shell company named Anika), 1913 (shell company named Univers)). Some of the shell companies (the "first-tier shells") received money directly from the Hermitage Companies (A. 1911-12 (Fausta), 1912-13 (Anika)), and others (the "second-tier shells") received money both from the first-tier shells and from the Hermitage Companies directly (A. 1911 (Parfenion to ZhK directly), 1911-12 (Parfenion to Fausta to ZhK), 1913 (Rilend to Univers directly), 1911-14 (Parfenion to Fausta to Univers), 1912-14 (Makhaon to Anika to Univers)).

---

does not allege that Prevezon was directly involved in the arrest, detention, or death of Magnitsky.

After passing through the second-tier shells, 815,000,000 rubles (or approximately $32.9 million) of the fraud proceeds landed in an account held by Bank Krainiy Sever. (A. 1914-15). From that account, the fraud proceeds, commingled with other money, were transferred to bank accounts at a Moldovan bank held by two shell companies, Bunicon-Impex SRL ("Bunicon") and Elenast-Com SRL ("Elenast"). (A. 1914-15). On the day it made its last transfer to Elenast, the Bank Krainiy Sever account was seized pursuant to a Russian court order, and the bank's license was ultimately canceled for money laundering. (A. 1915).

From the Bunicon and Elenast accounts, $857,354 was transferred by wire into an account held by Prevezon in February 2008. (A. 1918). Among the suspicious indicia surrounding this transfer was the fact that Bunicon and Elenast were shell companies without real business addresses (A. 1915-16, 1950-53), and that the bank records reflecting the transfers describe them as prepayment for sanitary equipment (A. 1921), which is a false description of the transfer's purpose (A. 1920-21). Moreover, both Bunicon and Elenast submitted forged contractual documents to their bank in order to justify the wire transfers. (A. 1921-22). Those documents, which specified the sanitary equipment Prevezon was supposedly supplying, were signed by an unnamed purported representative of Prevezon. (A. 1921-22).

Beyond receiving $857,354 from Bunicon and Elenast directly, Prevezon also received an additional $1,108,090.55 from Bunicon through multiple addi-

tional levels of intermediaries using two different routes.[4] On February 5, 2008, a day before sending funds to Prevezon directly (A. 1918), Bunicon wired $951,400 to an account held by the New Zealand company Megacom Transit, which was an apparent shell company with no known business activities directed by a nominee who was listed as a director of over 200 New Zealand companies. (A. 1923-24).[5] Of this $951,400, Megacom Transit transferred $390,000 to the bank account of a British Virgin Islands company ("Company-1") on February 20, 2008, described as payments for spare auto parts. (A. 1924). On February 6, 2008, the day it sent funds to Prevezon directly, Bunicon sent $942,700 to an account in the name of Castlefront, a United Kingdom shell company controlled through another company by the same nominee director of Megacom Transit. (A. 1924-25).[6]

---

[4] This additional $1,108,090.55 was not described in the initial complaint, which based its claims on the laundering of the $857,354 sent directly to Prevezon. In October 2014, further investigation revealed that the additional $1,108,090.55 constituted proceeds of the $230 million fraud scheme. (A. 1744-45).

[5] This transfer was supported by a purported contract between Bunicon and Megacom Transit for heating devices. (A. 1923-24).

[6] As with its transfers to Castlefront and to Prevezon directly, Bunicon submitted a purported contract to its bank to justify its wire transfer. (A. 1925-26).

Castlefront then sent a total of $1,986,000 to Company-1, also described as for spare auto parts. (A. 1926).

The transfers from Megacom Transit and Castlefront delivered a total of $1,332,700 in fraud proceeds to Company-1. Company-1, in turn, transferred $1,108,090.55 of the fraud proceeds to Prevezon through multiple transactions spanning almost a month. From February 28, 2008 to March 20, 2008, Company-1 made seven transfers of funds totaling $1,108,090.55 to Prevezon for "auto spare parts." (A. 1926). Entirely inconsistent with that description, Prevezon's business is real estate, not the manufacturing or distribution of auto parts. (A. 810-13, 1921, 1926-31).

At the time that Prevezon received the $857,354 from the Bunicon and Elenast accounts in Moldova and the $1,108,090.55 from Bunicon through Company-1, it was owned by Timofey Krit, but its Swiss bank accounts were held by Alexander Litvak. (A. 1919). Both Krit and Litvak were associates of Denis Katsyv, who purchased Prevezon later in 2008. (A. 1919). At the time of the purchase, Katsyv was well aware of the prohibitions on money laundering, having paid millions of dollars to the Israeli government just two years prior to settle an allegation of money laundering in violation of an Israeli money laundering statute that has provisions similar to the money laundering laws of the United States. (A. 1922-23).

Between November 2009 and September 2012, Prevezon purchased Manhattan real estate using funds in its own accounts and accounts held by Kat-

syv, Krit, and Litvak. (A. 1889, 1919-20, 1927-31). A public relations representative of Katsyv stated that Prevezon received $857,354 from a "Mr. Kim" on behalf of a third party named Petrov and then invested that money in various New York real properties, understanding that the money was eventually to be returned to Petrov. (A. 1921, 1927). The purchase price of the New York real properties substantially exceeds $1,965,444.55. (A. 1927-31).

Both before and shortly after Katsyv purchased Prevezon, Prevezon transferred funds to the Netherlands for a joint investment with a different company, AFI Europe. (A. 1918-19). AFI Europe subsequently returned a portion of the investment to Prevezon to fund the purchase of some of the New York real estate. (A. 1927-28). In 2013, AFI Europe repurchased the remainder of Prevezon's interest in the joint investment, and in doing so incurred a debt to Prevezon. (A. 1931). That debt has been restrained by the Netherlands pursuant to a treaty request. (A. 1931).

## C. The Complaint and Protective Order

On September 10, 2013, the Government filed the Complaint, seeking the forfeiture of Prevezon's assets and money laundering penalties against Prevezon. On September 11, 2013, the District Court entered the Protective Order, restraining the transfer of Prevezon's assets. (A. 80-88).

On December 11, 2013, Prevezon moved to vacate or modify the Protective Order because the Complaint purportedly: (i) failed to allege that fraud proceeds were transferred to Prevezon (A. 172-76); (ii)

failed to allege a culpable mental state (A. 161-63, 167-68); (iii) did not describe the property to be restrained with sufficient specificity (A. 169-70); (iv) reached assets that were not the laundered funds themselves (A. 170-72); and (v) restrained property located abroad (A. 166-68).

On January 7, 2014, the District Court declined to vacate the Protective Order, holding that the allegations in the Complaint were sufficient to support the order, but it reserved decision on whether to modify the scope of the order. (A. 374-75).[7]

### D. The Deposition and Further Motions

On January 29, 2014, pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, which requires the parties to meet and "attempt[ ] in good faith to agree on the proposed discovery plan," Prevezon proposed a discovery plan with a ten-month discovery and motion schedule. (A. 737-39). At a February 14, 2014 court conference, however, Prevezon abandoned its proposal and demanded that trial begin in six weeks.[8]

---

[7]    The District Court sharply rejected Prevezon's characterization of the Complaint. (A. 368 ("THE COURT: What you say is—it isn't that there's no merit in anything you say, but most of it is contrary to what is in the record, flatly contrary to what is in the record. Do you think I can't read? . . . This is just shocking.")).

[8]    This demand was made prior to the commencement of any discovery, and even before Prevezon responded to limited and expedited discovery re-

The District Court granted this request but subsequently adjourned the trial after learning of Prevezon's abandoned proposal for discovery and motions. (A. 422).

On March 3, 2014, prior to the adjournment of the trial, Prevezon's counsel began the deposition of Special Agent Todd Hyman under Rule 30(b)(6). Special Agent Hyman was repeatedly asked to provide his lay opinion on legal conclusions and interrupted when he tried to answer. On several occasions, confused by the sense of the word "evidence" being used by Prevezon's counsel, Special Agent Hyman said the Government had no evidence on certain points (A. 620, 624-25, 637), but at other times, when the questions were phrased in a less confusing fashion or when he was given a chance to answer, he described evidence the Government had on those same points (A. 625-26, 628, 632, 641). The deposition was stopped before it was finished, and it remains incomplete.

Prevezon then filed a motion to dismiss the Complaint, both for failure to state a claim and as a Rule 11 sanction because Special Agent Hyman's testimony at the deposition purportedly showed that the Complaint was filed without adequate factual sup-

---

quests the District Court had authorized in early January. A brief written statement made in response to those requests was subsequently provided (A. 809-18) and remains the only document discovery conducted to date.

port. This motion, which was mooted by the filing of the Amended Complaint, has not been renewed.[9]

### E. The Amended Complaint and Prevezon's Motion to Dismiss

On October 31, 2014, after further investigation revealed the additional $1,108,090.55 Prevezon received from Bunicon through Company-1, as well as more detail on the fraudulent paperwork supporting the transfers, the Government moved to file the Amended Complaint and Amended Protective Order, both to narrow the scope of the forfeiture sought and to allege additional facts supporting forfeiture. (A. 1744-47). The Amended Complaint made the following changes:

- It narrowed the scope of assets being sought, forgoing claims to the forfeiture of any and all assets and instead seeking forfeiture only of the New York properties purchased by Prevezon and their sale and rental proceeds, as well as a debt to Prevezon related to the joint investment in the Netherlands.

- It included the allegation that Katsyv, the owner of Prevezon, was aware of the prohibition on money laundering due to

---

[9] In addition, Prevezon did not comply with Rule 11(c)(2)'s requirement that a Rule 11 motion must be made separately from any other motion and only after a 21-day safe harbor period to allow the adversary to correct any alleged errors. (A. 940-41).

his 2005 settlement of a confiscation proceeding under Israel's money laundering laws, which are materially similar to those of the United States.

- It included allegations that the $857,354 in transfers directly from Bunicon and Elenast to Prevezon were supported by sham contractual documentation purportedly signed by an unnamed representative of Prevezon.

- It included allegations that Prevezon received an additional $1,108,090.55 of fraud proceeds from Bunicon through extra layers of intermediaries, for a total of $1,965,444.55 laundered.

The Government also proposed an Amended Protective Order, which simply narrowed the Protective Order by limiting the assets restrained to those specified in the Amended Complaint. (A. 1748-50). Over Prevezon's objection, the District Court granted the Government's motions to amend. (A. 1966-67).[10] The Government filed the Amended Complaint and the District Court entered the Amended Protective Order on November 5, 2014.

On January 12, 2015, Prevezon moved to dismiss the Amended Complaint because it purportedly: (i) requires extraterritorial application of the wire fraud

---

[10] The District Court also reiterated its denial of Prevezon's motion to vacate the Protective Order. (A. 1969).

statute (Add. 24-26); (ii) does not trace any fraud proceeds to Prevezon (Add. 26-30); (iii) does not allege that any fraud proceeds were invested in New York (Add. 31-34), a guilty mental state (Add. 34-36), or a substantial connection to the underlying fraud scheme (Add. 36-37); and (iv) was not properly verified (Add. 37-39).

To date, the District Court has not ruled on Prevezon's motion to dismiss the Amended Complaint.[11]

## ARGUMENT

## POINT I

## This Court Lacks Jurisdiction To Hear This Appeal

### A. Applicable Law

"Interlocutory orders are generally non-appealable unless they fulfill the requirements of [Title 28, United States Code, Section 1292(a)]." *United States* v. *Victoria-21*, 3 F.3d 571, 574 (2d Cir. 1993). While that section authorizes interlocutory appeals from orders "granting, continuing, . . . or refusing to dissolve or modify injunctions," 28 U.S.C. § 1292(a)(1), this Court

---

[11] The Government informed the District Court that Prevezon had raised the same issues in this expedited appeal, and suggested that although the District Court retained jurisdiction, *see N.Y. State Nat'l Org. for Women* v. *Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989), judicial economy counseled awaiting this Court's decision.

has held that the term "injunction" in that statute refers to "orders issued pursuant to the equity powers of the district courts, not those issued under statutes providing for preliminary relief." *Korea Shipping Corp.* v. *N.Y. Shipping Assoc.*, 811 F.2d 124, 126 (2d Cir. 1987). When a district court enters an order pursuant to a statute authorizing preliminary relief and does not consider "any of the traditional standards governing the issuance of preliminary injunctions," the order is not "a preliminary injunction within the meaning of 28 U.S.C. § 1292(a)(1)." *Id.*

Interlocutory orders that do not fall within Section 1292(a)(1)'s definition of injunction but nevertheless "have the 'practical effect' of a preliminary injunction are appealable if the appellant demonstrates that absent the relief, it faces 'serious, perhaps irreparable, consequences.'" *Borey* v. *National Union Fire Ins. Co.*, 934 F.2d 30, 35 (2d Cir. 1991) (quoting *Carson* v. *Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)). Where the interlocutory order at issue is a civil forfeiture order restraining or seizing assets, this Court has declined appellate jurisdiction unless the order will cause "the shutdown of an ongoing business enterprise." *United States* v. *All Assets of Statewide Auto Parts*, 971 F.2d 896, 901 (2d Cir. 1992). Where, however, the order will allow the status quo to be preserved, such that a business can continue to operate in some fashion, it is generally not immediately appealable. *Id.* (contrasting "occupancy agreement" allowing business to continue with "draconian restraints of an injunction and the intrusions of a receiver" shutting down business).

Even where a restraining order impedes the operations of a business, it is not appealable so long as the enterprise's operations have not been halted. In *United States* v. *Victoria-21*, this Court found no appellate jurisdiction where the business entity had failed to demonstrate that it had "no means of obtaining cash or continuing business" notwithstanding the seizure of assets essential to the business. 3 F.3d at 575 (describing seizure of "bank accounts and cash" and "several of its trucks"). Because the orders at issue did not empower the government to "physically seize[ ] the [business] premises and all [its] assets, cut off utility services and h[a]ng out a sign stating that business was closed," they were not the proper subject of an interlocutory appeal. *Id.*; *see also United States* v. *Quintana-Aguayo*, 235 F.3d 682, 685 (1st Cir. 2000) (perceiving no jurisdiction where "[t]he seizure ousted claimants from, but did not close, the ranch").

**B.  Discussion**

The Amended Protective Order was issued pursuant to Title 18, United States Code, Section 983(j)(1)(A), which empowers district courts to "enter a restraining order or injunction . . . or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture" after the government commences forfeiture proceedings. 18 U.S.C. § 983(j)(1)(A). Under this Court's precedents, the order is therefore not immediately appealable unless it has the effect of completely shutting down Prevezon's businesses. *See Victoria-21*, 3 F.3d at 575. But Prevezon has not even attempted to

establish that the Amended Protective Order has had such an effect on its business operations.[12] To the contrary, the evidentiary record demonstrates that Prevezon is continuing to operate even while the Amended Protective Order remains in effect.

First, the Amended Protective Order leaves valuable aspects of Prevezon's business operations entirely untouched. Prevezon comprises a group of real estate companies owned by Katsyv. (A. 97, 101, 1889). In a sworn statement provided in preliminary discovery, Katsyv stated that Prevezon Holdings (the parent company) and two partner companies "own a 50 percent share in a hotel and land lot for construction on Cyprus." (A. 809). The Amended Protective Order has not had any effect whatsoever on those assets, which presumably continue to operate under the control of Katsyv and Prevezon. These untouched business assets standing alone demonstrate that the protective order at issue here is unlike the one that gave raise to appellate jurisdiction in *United States* v. *All Assets of Statewide Auto Parts*. 971 F.2d at 901 ("district court's interlocutory order. . . required the businesses to remain closed").

Second, even as to the assets restrained by the Amended Protective Order, Prevezon's businesses

_____

[12] The original Protective Order restrained any and all assets of Prevezon, and an interlocutory appeal of that order might very well have been proper, but any such appeal is moot, as the Amended Protective Order vacated the original Protective Order. (A. 1875).

have not been shut down. Under court-approved agreements with the Government, Prevezon has engaged in sales of most of the real estate that is subject to the protective order—and this is the principal activity of a real estate investment business like Prevezon. (A. 1930-31).[13] Further, the provisions of the protective orders allowing the Government to authorize payments without order of the Court (A. 1879) have allowed Prevezon to continue collecting rent and paying necessary upkeep and management expenses prior to sale.[14]

Throughout this litigation, the Government has in good faith entered into agreements with Prevezon to allow it to conduct its business—collecting rent from real estate and selling real estate—during the pendency of the case. This belies the claim that the busi-

---

[13] The proceeds of these sales have been held by the Government under the terms of the interlocutory orders of sale to preserve the status quo. (A. 1930-31).

[14] In a statement submitted to the District Court, Prevezon's owner described an event in which the original Protective Order allegedly caused Prevezon to miss a mortgage payment, triggering a default rate (A. 815). Prevezon does not, however, urge this as an issue on appeal. That is with good reason—were the record developed sufficiently to allow this Court to pass upon this issue, it would show that Prevezon never sought authorization from the Government to make this payment before it came due, and that when Prevezon has sought authorization to make payments it has routinely been promptly granted.

ness has been shut down and further defeats any basis for appellate jurisdiction. *See All Assets of Statewide Auto Parts, Inc.*, 971 F.2d at 901 ("Had the government entered into an occupancy agreement with the owners and operators of Statewide, as was done in others of our pre-hearing seizure cases, the district court's order probably would not have been appealable, as the status quo would have been preserved . . . ."). Indeed, the way the Government has proceeded—*lis pendens* and restraining order—has specifically been endorsed as a less restrictive means of preserving the status quo (and a district court's in rem jurisdiction) during the pendency of a forfeiture case. *See United States* v. *Premises & Real Prop. At 4492 S. Livonia Rd.*, 889 F.2d 1258, 1265 (2d Cir. 1989).

Tellingly, the only hardships Prevezon complains of with any specificity have little to do with the Amended Protective Order. Prevezon observes that it is always preferable to have money unfrozen (Br. 23), which falls squarely within this Court's holding that "diminished business and cash flow" do not themselves give rise to appellate jurisdiction. *Victoria-21*, 3 F.3d at 574-75. Prevezon also complains that it has been unable to repay the investor Petrov who is the purported source of the funds giving rise to this action. (Br. 23). Even if that is a hardship on Prevezon at all, the inability to pay an outside investor is insufficient to establish appellate jurisdiction. *See Victoria-21*, 3 F.3d at 575 (rejecting appeal where a company "cannot post a bond," a "bank has called in a loan, and customers have refused to pay on their accounts"). The other claimed hardships seemingly

have nothing at all to do with the Amended Protective Order; instead, they involve allegations of reputational harm inflicted by the existence of this litigation. (Br. 23). The Government does not doubt the reputational impact of this case, but such effects are present to some degree in every forfeiture case—which necessarily involve an accusation that the property sought is connected to a crime—and in any event is caused by the Amended Complaint, not the Amended Protective Order.[15]

## POINT II

### Prevezon's Challenges to the Amended Complaint Should Be Addressed by the District Court in the First Instance

Prevezon's challenge to the Amended Protective Order arises entirely from its arguments for dismissing the Amended Complaint. (Br. 25-43). But Prevezon's motion to dismiss the Amended Complaint has not yet been decided by the District Court. By press-

---

[15] Though there is a statutory provision allowing the release of seized property on grounds of hardship, *see* 18 U.S.C. § 983(f), Prevezon has not invoked that provision, nor could it. Relief under that provision requires, among other things, a showing of harm somewhat similar to that necessary to give this Court appellate jurisdiction, *see* 18 U.S.C. § 983(f)(1)(C) (requiring, *inter alia*, showing of hardship such as "preventing the functioning of a business"), and Prevezon's failure to even try to make that showing below is telling.

ing this challenge here, Prevezon asks this Court to pass upon the sufficiency of the Amended Complaint in the first instance. That request violates this Court's "'settled practice to allow the district court to address arguments in the first instance.'" *Fulton* v. *Goord*, 591 F.3d 37, 45 (2d Cir. 2009) (quoting *Farricielli* v. *Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000)); *see also Schonfeld* v. *Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000) ("Although we are empowered to affirm a district court's decision on a theory not considered below, it is our distinctly preferred practice to remand such issues for consideration by the district court in the first instance."). Prevezon presents this Court with no good reason, and the Government is aware for none, for deviating from this Court's "sound judicial administration" of allowing the District Court here to decide in the first instance whether the Amended Complaint should be dismissed. *Farricielli* v. *Holbrook*, 215 F.3d at 246.

There can be no dispute that every one of the issues presented by this appeal is simultaneously before the District Court. On January 12, 2015, Prevezon moved to dismiss the Amended Complaint, raising identical arguments to those presented in its brief on appeal to this Court, which was filed three days later. (*Compare* Br. 25-28 (extraterritorial application) *with* Add. 24-26 (same); *compare* Br. 31-35 (tracing of funds to Prevezon) *with* Add. 26-30 (same); *compare* Br. 36-38 (investment of fraud proceeds in New York) *with* Add. 31-34 (same); *compare* Br. 38-40 (guilty mental state) *with* Add. 34-36 (same); *compare* Br. 40 (substantial connection to fraud scheme) *with* Add. 36-37 (same); *compare* Br. 40-43 (verification)

*with* Add. 37-39 (same)). With several conforming changes, the bulk of Prevezon's appeal brief is verbatim with its motion to dismiss the Amended Complaint, which has not yet been decided by the District Court.

Rather than await a ruling by the District Court in the first instance, Prevezon chose to submit essentially the same motion, supported by the same arguments, to this Court. This Court's precedents do not countenance such efforts to bypass district courts. *See, e.g.*, *Frontera Res. Azer. Corp.* v. *State Oil Co. of the Azer. Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (because issue "ha[d] not been decided" by district court, "it would be premature for us to address this question without hearing first from the court below"). Prevezon presents no sound reason to deviate from precedent here, nor is one readily apparent: Prevezon is fully capable of litigating its motion to dismiss in the District Court, and indeed is doing so currently. The District Court has not indicated an unwillingness to consider the motion or expressed any conceivable form of prejudice against Prevezon. There is simply no good reason to bypass the District Court here.

It is no answer for Prevezon to point to its earlier —and now moot—motion to dismiss the original Complaint. While that motion presented some similar arguments to those raised on appeal, those arguments were never reached by the District Court because the filing of the Amended Complaint rendered the motion moot. In addition, the Amended Complaint is substantially different from the Complaint, as it contains new allegations bearing on asset trac-

ing and on Prevezon's intent (A. 1922-27), while also narrowing the property that is alleged to have been involved in money laundering (A. 1885-87), and the verification is based on additional investigation (A. 1747). The earlier motion does not address those changes. Finally, Prevezon's arguments about extraterritoriality were first presented to the District Court in the January 12, 2015 motion, three days before being presented here. The place for all of these issues to be resolved in the first instance is the District Court, followed by an appeal to this Court if necessary.

## POINT III

## The Amended Complaint States a Claim

### A.  Applicable Law

The complaint in a civil forfeiture action must meet the pleading requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Forfeiture Rules"), which requires the complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Forfeiture Rule G(2)(f). Under that standard, a civil forfeiture complaint must do more than satisfy the notice pleading standards of the Federal Rules of Civil Procedure. *See, e.g.*, *United States* v. *Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993), *superseded on other grounds by* 18 U.S.C. § 983(c)(3). It must support a reasonable belief that the Government will establish by a preponderance of the evidence that the

assets named in the complaint are subject to forfeiture. *See* 18 U.S.C. § 983(c)(1); *United States* v. *Daccarett*, 6 F.3d at 47.

After a forfeiture complaint has been filed, "[a] claimant who establishes standing to contest forfeiture may move to dismiss the action under Rule 12(b)" of the Federal Rules of Civil Procedure. Forfeiture Rule G(8)(b). When a motion to dismiss is based on the failure to state a claim, that motion should be denied where the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)); *see United States* v. *$22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 & n.25 (S.D.N.Y. 2010) (*Iqbal* and *Twombly* do not themselves alter standards applicable to civil forfeiture cases, but impose a "substantially similar" standard to Rule G(2)(f)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. at 663.

When deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth* v. *Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (internal quotation marks omitted); *see also United States* v. *$22,173.00 in U.S. Currency*, 716 F. Supp. 2d at 252 n.45 (applying standard in forfeiture proceedings);

*Bell Atlantic Corp.* v. *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."). The court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Walker* v. *Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (internal quotation marks and citations omitted); *accord United States* v. *Painting Known & Described as Madonna & Child*, No. 14 Civ. 4485, 2015 WL 108416, at *3 (S.D.N.Y. Jan. 6, 2015) (applying standard in forfeiture case).

To withstand a motion to dismiss, the Government is not required to come forward with evidence sufficient to establish that the named property is subject to forfeiture. Under the relevant statute, "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *accord* Rule G(8)(b)(ii). In fact, it is expressly contemplated that evidence will continue to be uncovered during the course of the ligation, as "the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture." 18 U.S.C. § 983(c)(2).

## B. Discussion

### 1. The Amended Complaint Does Not Allege an Extraterritorial Violation of U.S. Law

Prevezon argues that its laundering of fraud proceeds in the United States cannot give rise to a forfeiture action because the underlying fraud took place in Russia. (Br. 26-27). That argument is flatly contradicted by the express language of the money laundering statute, which authorizes prosecution in the United States where the predicate offense is committed abroad, so long as the proceeds are laundered "in whole or in part in the United States." 18 U.S.C. § 1956(c)(7)(B). Even if the violations of foreign law were inadequate money laundering predicates, the fraud also involved use of wires in the United States, which would constitute domestic wire fraud, providing another predicate for money laundering. Under either theory, the Amended Complaint alleges a money laundering offense that can be prosecuted in the United States.

Under the money laundering statute, offenses against Russian law that involve (i) "fraud, or any scheme or attempt to defraud, by or against a foreign bank" or (ii) "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" are money laundering predicates. 18 U.S.C. § 1956(c)(7)(B) (iii), (iv). Here, the Amended Complaint alleges that Prevezon laundered in Manhattan the proceeds of a Russian tax fraud scheme that violated Russian laws prohibiting fraud on a bank and misappropriation, theft, or embezzlement of

public funds by or for the benefit of public officials. (A. 1890, 1894-95 (alleging that ownership of Hermitage companies was fraudulently transferred away from non-US HSBC entity to conspirators), 1891-92, 1898-99 (alleging that members of the Organization who were tax officials "corruptly approved" tax refunds), 1916-17 (noting that tax refund proceeds were transferred to tax official through her then-husband)). Those allegations support a reasonable belief that the Government would be able to prove at trial that this conduct violates multiple provisions of Russian law, including Article 159 of the Russian criminal code, which prohibits theft by fraud. Indeed, the Russian courts themselves have rendered guilty verdicts against two of the participants in this scheme, albeit providing somewhat different factual narratives than alleged here. (A. 1907). The Amended Complaint's credible alleged violations of Russian law provide sufficient predicates under the money laundering statute for a domestic prosecution.

Prevezon relies on the presumption against extraterritoriality to limit the reach of the money laundering statute. (Br. 26-27). But that presumption is rebutted where, as here, "there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect." *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). The text of Title 18, United States Code, Section 1956(c)(7)(B) makes plain that money laundering "occurring in whole or in part in the United States" can be prosecuted where the laundered funds are the proceeds of specified "offense[s] against a foreign nation." That express provision renders the presumption inapplica-

ble here and causes the alleged violations of Russian law to be adequate predicates of money laundering.

But even if the violations of Russian law were not sufficient predicates under the money laundering statute, domestic wire fraud under Title 18, United States Code, Section 1343 would constitute a fully sufficient predicate in its own right. The Supreme Court has held that a scheme to defraud a foreign government of tax revenue violates the wire fraud statute if it involves the use of U.S. wires. In *Pasquantino* v. *United States*, the Supreme Court held a wire fraud prosecution proper where "U.S. interstate wires [were used] to execute a scheme to defraud a foreign sovereign of tax revenue." 544 U.S. 349, 371 (2005). Expressly rejecting the argument that such a prosecution would be improperly extraterritorial, the Court reasoned that the statute punishes the domestic use of the United States wires themselves:

> Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue. Their offense was complete the moment they executed the scheme inside the United States; the wire fraud statute punishes the scheme, not its success. This domestic element of petitioners' conduct is what the Government is punishing in this prosecution, no less than when it prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant.

*Id.* (internal quotation marks and citations omitted); *see also United States* v. *Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997). So too here, the "domestic element of [the Organization's] conduct," *Pasquantino*, 544 U.S. at 371, in using the United States wires to execute a scheme to defraud a foreign sovereign of tax revenue by transmitting the ill-gotten revenue to the fraudsters, is wire fraud punishable under Section 1343. The Supreme Court reaffirmed this principle in *Morrison* v. *National Australia Bank Ltd.*, where it distinguished the securities fraud case before it from the wire fraud at issue in *Pasquantino* based on the difference in wording of the relevant statutes. 561 U.S. at 271-72 (explaining that unlike wire fraud, securities fraud "punishes not all acts of deception, but only such acts in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered"). Where U.S. wires are used in furtherance of a deception, a wire fraud prosecution may be brought in the United States even if the expected payoff from the fraud occurs in a foreign country.

Though Prevezon tries to minimize the significance of U.S. wires here (Br. 27-28), the Amended Complaint alleges that the wires played an integral role in the scheme. Hundreds of thousands of dollars of fraud proceeds were wired through the United States in order to pay back one of the Russian tax officials who had corruptly approved the fraudulent tax refund. (A. 1917). The use of U.S. wires to deliver fraud proceeds to perpetrators is hardly a tangential detail. To the contrary, the wires furthered the core aim of the fraud: enriching the perpetrators. And it

was significant that these were U.S., rather than Russian, wires because they shielded the perpetrators from detection by Russian authorities and thereby allowed the scheme to succeed and continue. (A. 1907). This use of domestic wires is at least as significant and material here as it was in *Pasquantino*, where a U.S. telephone call was made to order items as to which Canadian tax was to be avoided. *See Morrison*, 561 U.S. at 271-72.[16] Whether U.S. wires were used to procure the taxable item (as in *Pasquantino*) or to surreptitiously transmit the fraud proceeds to the perpetrators (as here), their use was integral to the success of the scheme and a "domestic element of [the fraudsters'] conduct" constituting wire fraud. *Pasquantino*, 544 U.S. at 371.[17]

Finally, there can be no legitimate dispute that money laundering is alleged to have taken place in the United States. According to the Amended Complaint, Prevezon laundered fraud proceeds by invest-

---

[16] The United States conduct is thus far more central to the fraud scheme than in *Petroleos Mexicanos* v. *SK Engineering & Construction Co., Ltd.*, where the only United States activity was the ministerial processing of payments that did nothing to disguise the participants of the fraud scheme or permit them to continue operating. 572 F. App'x 60, 61 (2d Cir. 2014).

[17] Prevezon's assertion that it did not benefit from the wires in question is beside the point. (Br. 10). Prevezon is alleged to have been a launderer of fraud proceeds not a perpetrator of the fraud.

ing them in Manhattan, where they remain to this day, either in the custody of the United States due to court-approved sales of Manhattan real estate or in the purchase of real estate itself. (A. 1929-31). It is exactly this sort of "financial transaction occurring in whole or in part in the United States" that the money laundering statute prohibits.

### 2. The Amended Complaint Alleges that the Defendants Received Fraud Proceeds

Prevezon argues that the Amended Complaint fails to allege that it received fraud proceeds. (Br. 31-35). This contention ignores the extensive allegations in the complaint detailing the flow of funds through shell companies to Prevezon.

Where crime proceeds are commingled with other funds in a bank account, either the funds that remain in the account or the funds that leave the account can be treated as traceable proceeds, up to the extent of the crime proceeds. *See United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986); *see also United States* v. *Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (noting *Banco Cafetero*'s "accounting choices"). Indeed, these assumptions can be used in combination to track the flow of funds through multiple accounts and multiple transactions. *See United States* v. *Corey*, No. 04 Cr. 349 (EBB), 2006 WL 1281824, at *9 & n.11 (D. Conn. May 9, 2006).[18]

---

[18] The Defendants overstate the level of detail that a complaint must contain. Contrary to the Defendants' demands for "a fulsome record of all of the

The tracing allegations in the Amended Complaint, using these "accounting choices," *United States* v. *Walsh*, 712 F.3d at 124, show that the relevant funds were transferred from the Russian treasury through multiple shell companies and ultimately to Prevezon. Prevezon's characterization of the tracing analysis is scarcely recognizable given the Amended Complaint's pages and pages of detailed tracing analysis, which provides date, amount, originator, and beneficiary information for numerous transfers in small groupings. (A. 1909-11 (Russian treasury to stolen companies), 1911-14 (through first-tier and second-tier shell companies to Bank Krainiy Sever), 1914-16 (from Bank Krainiy Sever to Bunicon and Elenast), 1918 (from Bunicon and Elenast to Prevezon directly), 1923-26 (from Bunicon to Prevezon through intermediaries), 1916-18 (from Bunicon back to the Organization))). *See United States* v. *All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 70 &

---

account transactions, including account balances, withdrawals, transfers, and deposits" (Br. 32), courts will sustain forfeiture complaints against dismissal even without resolving tracing challenges. *See, e.g.*, *United States* v. *All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 68 (E.D.N.Y. 2003) (rejecting argument that "the government is required to allege facts showing that each transfer can be traced to specific deposits of criminally derived monies," holding "the court need not pass on the government's ultimate burden of proof regarding traceability").

n.21 (E.D.N.Y. 2003) (finding forfeiture complaint adequate where it contains "amounts and dates of the transfers and the properties purchased"). In light of this level of detail, Prevezon's observations that a complaint cannot rely upon mere "conclusory allegations" (Br. 32 n.10), generalized assertions of a "'pattern' suggestive of money laundering" (Br. 33 n.11), or "mere suspicion," (Br. 33 n.11) (internal quotation marks omitted), are irrelevant. The Amended Complaint does nothing of the kind.

Notwithstanding Prevezon's broad challenge to the Amended Complaint's tracing of fraud proceeds, it really disputes only a small portion of the tracing analysis: the allegation that the funds received by Bunicon and Elenast from the Bank Krainiy Sever account were proceeds of the fraud. (Br. 33-35). In pressing this argument, Prevezon must rely on purported facts that are not alleged in the Amended Complaint (Br. 32 (describing unavailability of records)) and therefore not relevant at this stage of the proceedings. *See Walker* v. *Schult*, 717 F.3d at 124 (court's task on motion to dismiss is "not to assay the weight of the evidence" (internal quotation marks omitted)); 18 U.S.C. § 983(a)(3)(D) ("No complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.").

Even if such an inquiry was proper at this stage of the litigation, Prevezon's argument relies entirely on two incorrect premises. First, Prevezon claims that because the Bank Krainiy Sever account transferred

out, in total, more funds than the fraud proceeds it is alleged to have received, there is purportedly only a chance that the funds used by Bunicon and Elenast were crime proceeds. (Br. 34).[19] Second, Prevezon contends that the Bank Krainiy Sever account is a "concentration account" and it is therefore permissible to speculate about the source of the funds it contained. (Br. 33-35).

Neither objection is persuasive. Under well-settled precedent, Prevezon is not empowered, on a motion to dismiss, to choose a tracing methodology (let alone devise a new "only a chance" methodology for this case) that is least favorable to the Government's case. To the contrary, the Government is entitled to the benefit of any of the "accounting choices" recognized in this Court's prior decisions on asset tracing. *See Walsh*, 712 F.3d at 124. Under the so-called "drugs-in first-out" methodology, the funds flowing from Bank Krainiy Sever to Bunicon and Elenast (and to the post-Bunicon intermediaries Megacom Transit Limited, Castlefront, and Company-1) that ultimately landed in Prevezon's accounts are traceable to fraud. (A. 1909-16, 1918-27).[20]

---

[19] Even if that premise were correct, it would not invalidate the Amended Complaint, as the applicable pleading standards do not "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. In any event, it is not correct.

[20] This approach allows the Court "to consider 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, to the extent

While that accounting choice alone provides a complete answer to Prevezon's critique of the tracing analysis, the Amended Complaint provides even more reasons to reject Prevezon's arguments. Numerous facts corroborate the inference that Prevezon accepted fraud proceeds. First, Bunicon wired a portion of the funds it received from the Bank Krainiy Sever "concentration account" (*i.e.*, the funds that Prevezon speculates may have been unrelated to the fraud) back to the very tax official who authorized many of the fraudulent tax refunds as an apparent payoff. (A. 1916-17). Second, the funds Prevezon received from Bunicon were sent using false wire transfer descriptions and false contractual documentation. (A. 1921-22, 1926). Third, the funds Elenast sent to Prevezon were accompanied by contractual documentation bearing the same false payment description— down to the same type of purported sanitary equipment—as the funds Bunicon sent. (A. 1921-22).

---

of " the original deposit of tainted funds in the account. *United States* v. *Banco Cafetero*, 797 F.2d at 1159. As this description indicates, "any one withdrawal" can be considered to be proceeds of the crime even if it is not the first withdrawal following the deposit of illicit funds. *Id.*; *see also United States* v. *Corey*, 2006 WL 1281824, at *9 n.11 (debiting fraud balance in account by amount of specified withdrawal even though there had been intervening withdrawals since deposit of crime proceeds); Exs. to Mot. Summ. J. of United States at 3, *Corey*, No. 04 Cr. 349 (EBB) (D. Conn. July 8, 2005) (ECF No. 31) (showing intervening withdrawals).

Fourth, the fact that Bunicon, Elenast, Megacom Transit, and Castlefront are all shell companies without any legitimate business (A. 1915-16, 1924-25) further supports the inference that the funds they received from Bank Krainiy Sever were crime proceeds.[21]

### 3. The Amended Complaint Alleges that Prevezon Purchased Manhattan Real Estate with Fraud Proceeds

Prevezon contends that the funds it received from Bunicon, Elenast, and Company-1 were not used to purchase any real estate in New York. (Br. 36-38). But that contention ignores the facts alleged in the Amended Complaint, which states that the funds Prevezon invested in New York real estate were traceable to the transfers from Bunicon, Elenast, and Company-1. Among other things, the Amended Complaint alleges that a representative of Katsyv admitted as much, saying that after receiving $857,354 from Bunicon and Elenast, Prevezon "invested [the funds] in various New York real properties, and . . . would manage these assets for five years and then transfer the properties to Mr. Petrov in full." (A. 1927). That admission alone suffices at this stage

---

[21] Even if the Amended Complaint could be faulted for lacking further itemization of the movement of funds within the Bank Krainiy Sever account or other tracing particulars, the proper remedy is not the dismissal of this action but leave to re-plead so that additional detail can be provided.

to establish a reasonable belief that Prevezon invested the funds it received from Bunicon and Elenast—*i.e.*, fraud proceeds—in Manhattan real estate.

Prevezon attempts to contradict the admission of its own representative by claiming that bank records show that the relevant funds were invested with AFI Europe in the Netherlands (Br. 36-37), and by noting that the funds to purchase some of the New York properties came from a separate bank account (Br. 37-38). Again, at this stage of the litigation, Prevezon cannot challenge the adequacy of a complaint by relying on records that purportedly contradict the allegations in that complaint. *See Walker*, 717 F.3d at 124; 18 U.S.C. § 983(a)(3)(D). Even as to the AFI Europe transactions, the Amended Complaint alleges that some of the fraud proceeds passed through AFI Europe and were then used to purchase two parcels of New York real estate. That allegation, supported by the admission of Prevezon's representative, is sufficient at this stage to withstand a motion to dismiss. (A. 1927-28).[22]

---

[22] This transfer is sufficient to invoke the Court's jurisdiction even if a portion of the funds remained in the Netherlands. The funds in the Netherlands are subject to the in rem jurisdiction of the Court given the cooperation of the Government of the Netherlands. *See United States* v. *All Funds on Deposit in Any Accounts Maintained in Names of Meza or De Castro*, 63 F.3d 148, 153-54 (2d Cir. 1995) (finding cooperation of a foreign government in restraining assets gave court in rem jurisdiction).

Furthermore, it is entirely plausible that funds from the Netherlands were allocated to the various real estate transactions through an off-the-books agreement with Petrov. In light of the secretive nature of the transfers of the $1,965,444.55—involving false descriptions for the purposes of the funds (A. 1921-22, 1926), transfers directly from shell companies (A. 1915-16, 1918), and transfers from a shell company through intermediaries (A. 1923-26)—such an informal accounting mechanism seems particularly likely here. It is just the type of arrangement that further discovery in this matter might illuminate, which is exactly why it is premature to consider Prevezon's argument at this stage of the litigation.

### 4. The Amended Complaint Alleges a Culpable Mental State

Prevezon faults the Amended Complaint for containing inadequate allegations of scienter to commit money laundering. (Br. 38-40). That critique does not withstand scrutiny when measured against the detailed allegations of Prevezon's knowing participation in laundering the proceeds of criminal activity.

The Amended Complaint alleges that two Moldovan shell companies, which had no legitimate business activities, transferred $857,354 to Prevezon through wire transfers that falsely described the funds as prepayment for sanitary equipment. (A. 1918-23). It also alleges that one of Katsyv's representatives admitted that those transfers were in fact third-party payments for an investment in New York real estate. (A. 1920-21, 1927). According to the

Amended Complaint, one of these shell companies al-
so sent Prevezon an additional $1,108,090.55 through
multiple layers of intermediaries using two different
routes and generating paperwork that recorded a
false purpose for the transactions. (A. 1923-26). It
further alleges that the Moldovan shell companies
forged contract documentation that was signed by a
Prevezon representative and submitted it to a bank
to justify the wire transfers. (A. 1921-22).

These allegations fully support a reasonable infer-
ence that Prevezon either knew or consciously avoid-
ing knowing that it had received proceeds of a crime
before laundering them. *See United States* v.
*Nektalov*, 461 F.3d 309, 314-15 (2d Cir. 2006)
(knowledge that funds were proceeds of criminal ac-
tivity can be established through conscious avoid-
ance). The decision to conceal the true nature of the
transfers by accepting the funds that were document-
ed to have a false purpose—the purchase of either
sanitary equipment or spare auto parts—
demonstrates Prevezon's guilty knowledge. And the
Amended Complaint alleges that the Moldovan mon-
ey launderers presented to a bank in their jurisdic-
tion forged paperwork purportedly signed by a Preve-
zon representative. (A. 1921-22). If the signatures are
genuine, that constitutes devastating evidence of
Prevezon's guilty knowledge. But even if not, the
comfort the Moldovan money launderers displayed in
affixing Prevezon's name to forged paperwork is itself
damning. That comfort reflects their confidence that
Prevezon, unlike an innocent party, could be counted
on to raise no questions about the false nature of the

transaction. These allegations make out a fully adequate circumstantial basis for scienter.

Prevezon's only rejoinder is the implausible claim that it was, in fact, unaware that the senders of these funds had no real business activities and that false transaction records had accompanied the funds into Prevezon's own bank accounts. (A. 38-40). Once again, this factual dispute cannot provide a sound basis to dismiss the Amended Complaint. But even on its own terms, the contention that Prevezon had no idea it was dealing with shell companies is unlikely, and the idea that Prevezon was innocently unaware that funds were being transferred into its own bank accounts on false pretenses is preposterous. A business remaining unaware of the activity in its own operating account would face tremendous obstacles to day-to-day reconciliation, let alone to any accounting. And ignorance of the stated purposes for wire transfers would not only interfere with everyday activities but could open Prevezon to contractual liability upon accepting payments marked for goods (such as sanitary equipment and auto parts) that it was not in the business of selling and had no intention of supplying.[23] That a company would choose to do business in

----

[23] Bunicon or Elenast, as shell companies, would hardly sue Prevezon to force it to deliver them sanitary equipment, but a legitimate counterparty might. Prevezon's blitheness about accepting funds while either knowing or not bothering to check that the listed purposes for those funds were false bespeaks Prevezon's level of trust and understanding with the shell companies.

this fashion—even if true—would be a telltale sign of conscious avoidance. As this Court has recognized, albeit in a summary order, the acceptance of "large deposits" into accounts followed by "immediate withdrawals," all of which is "done without question," provides support for "the inference that [a person has] consciously avoided learning the nature of the activity in which she was involved while being aware of a high probability that she was participating in an illegal scheme," even under the stringent burden of proof applicable to a criminal case. *United States* v. *Tillman*, 419 F. App'x 110, 112 (2d Cir. 2011). Prevezon's alleged actions place it exactly in the same position as the defendant in *Tillman*, and amply justify proceeding under the less demanding civil standard applicable here.

Other allegations in the Amended Complaint support the inference that the criminals providing funds to Prevezon would not have done so if Prevezon was a truly innocent party. In criminal cases, conspirators' actions in entrusting a defendant with property only half as valuable as the $1,965,444.55 at issue here can strongly support an inference—beyond a reasonable doubt—that the defendant must have had a relationship of trust with the conspirators entailing knowledge of their criminal purpose. *See United States* v. *Anderson*, 747 F.3d 51, 66-73 (2d Cir. 2014) (finding that conspirators' actions in entrusting criminal defendant with bag containing $900,000 of drugs, together with evidence about practices of conspiracy, was sufficient to permit inference that conspirators must have informed defendant of the contents of the bag, which he never received); *see also id.* at 66-67

(collecting cases). That inference is further buttressed by the systematic, extensive, and ruthless nature of the criminal Organization, which resorted ultimately to lethal retaliation to protect the scheme.[24] (A. 1890-1908). Criminals operating with that level of sophistication and purpose are unlikely to entrust almost $2 million to Prevezon without an understanding that

---

[24] Prevezon is wrong to claim that the Amended Complaint's references to the Organization's lethal retaliatory actions against Sergei Magnitsky, a lawyer who uncovered the fraud scheme, are irrelevant, let alone improper. (Br. 9 n.3). Although the Government does not contend that Prevezon was directly involved in Magnitsky's death, the suspicious circumstances of Prevezon's receipt of the funds through a channel also used to send funds back to a member of the Organization permit—at a minimum—a reasonable inference that the Organization had enough of a trust relationship with Prevezon that its activities and retaliatory actions were known or reasonably foreseeable to Prevezon. In turn, Prevezon's knowledge and ability to foresee such violent conduct bears on whether any forfeiture would be disproportionate under the Eighth Amendment, a multi-factor inquiry including an assessment of the gravity of the offense. *See Von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007). Accordingly, though these facts may not ultimately be adduced at trial, *see* 18 U.S.C. § 983(g)(3) (Eighth Amendment determination is made "by the court without a jury"), there is good reason to include them in the Amended Complaint.

Prevezon would do nothing to jeopardize the scheme's success.

### 5. The Amended Complaint Alleges a Substantial Connection Between the Properties and Money Laundering

Prevezon claims that the Amended Complaint is flawed because it does not allege a "substantial connection" between the property identified for forfeiture and the $230 million fraud scheme. (Br. 40). Prevezon is mistaken. There is no need for the Amended Complaint to contain any such allegation because the Government's theory of forfeiture is that Prevezon used the assets to *launder* the proceeds of the fraud scheme, not to *carry out* the scheme. (A. 1884, 1931-40). Accordingly, the property must have a "substantial connection" to money laundering, not the underlying fraud. *See* 18 U.S.C. § 983(c)(3) ("[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.").

As alleged in the Amended Complaint, there can be no doubt that the assets in question had a "substantial connection" to the money laundering offense: they provided the very means of laundering the money. *See, e.g.*, *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 565 (S.D.N.Y. 2011) ("[R]eal property is involved in a money laundering offense if laundered funds are used to pay for improvements."

(internal quotation marks, brackets and ellipsis omitted)). Moreover, the assets named in the Amended Complaint served a crucial role in allowing the crime proceeds, after being shuttled quickly through numerous shell companies, to fully reenter the financial system and be held for long periods in apparently legitimate assets. (A. 1909-32). These allegations go far beyond what is required to satisfy the substantial connection test, under which property must have "more than an incidental or fortuitous connection to criminal activity," but need not be "integral, essential or indispensable" to the crime. *United States* v. *Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990). Here, the property was the very means by which the money laundering offense was carried out. That allegation is more than sufficient to withstand a motion to dismiss.

## POINT IV

### The Amended Complaint is Properly Verified

#### A.   Applicable Law

Forfeiture Rule G(2)(a) requires that a forfeiture complaint be verified. Construing that requirement, courts have held, that "[t]he sole purpose of verification is to cause an authorized official of the government to satisfy himself that the averments in the complaint are true" and that the allegations in a verified complaint can be "based either upon [the government official's] own knowledge or upon information and belief." *United States* v. *Banco Cafetero Int'l*, 608 F. Supp. 1394, 1400 (S.D.N.Y. 1985) (inter-

nal brackets and quotation marks omitted); *see also United States* v. *8 Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008) (holding that verification does not impose a personal knowledge requirement and "may be pled on information and belief" (internal quotation marks omitted)); *accord United States* v. *Any and All Funds Contained in BancorpSouth Account No. xxxx-581-3*, No. 12 Civ. 735 (SLB), 2013 WL 840042, at *7 (N.D. Ala. Mar. 6, 2013); *United States* v. *$22,010.00 in U.S. Funds*, No. 09 Cv. 198 (CAR), 2010 WL 1050410, at *1-2 (M.D. Ga. Mar. 18, 2010).

Verification is not a warranty that a complaint is supported by admissible evidence at the time of filing. Indeed, the governing forfeiture statute and Forfeiture Rule G provide that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); *accord* Forfeiture Rule G(8)(b)(ii); *see also* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture."). Whether sufficient admissible evidence ultimately supports a forfeiture action is addressed at later stages of the litigation that have nothing to do with verification.

## B. Discussion

Prevezon's allegation that the Amended Complaint "was not properly verified" is baseless. (Br. 40).

To carry its burden of proving this allegation, Prevezon would be expected, at a minimum, to come forward with some evidence showing that the Amended Complaint was not true "to the best of [the agent's] knowledge, information, and belief" (A. 1943) or that the basis for the complaint was not the "official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives during an investigation of alleged violations of Title 18, United States Code" (A. 1943). But Prevezon makes no effort to come forward with such evidence.

Instead, it complains about the investigation that the agent has conducted to date and whether it has yielded sufficient admissible evidence to prevail at trial. For example, Prevezon faults the agent for allegedly not having "spoken to [any] competent witnesses," lacking "admissible bank records," and relying "on a series of assumptions without authentic records" to trace the fraud proceeds. (Br. 42). Even if that characterization were fair—which it is not—the adequacy of the verified complaint would not be called into question.[25] That is because the applicable

_____

[25] Contrary to Prevezon's allegations, the Government has substantial documentation supporting the allegations of the Amended Complaint. Some of it is in admissible form already, some may require testimony or certifications from custodians, and some may ultimately not be admitted at trial. But these are issues for summary judgment or trial, not a motion to dismiss.

statute and rules do not permit a forfeiture complaint to be dismissed "on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); Forfeiture Rule G(8)(b)(ii). That basic principle of forfeiture law is enough to reject Prevezon's position.

But even if there was no categorical bar on dismissing a forfeiture complaint for insufficient evidence, Prevezon would still not have presented sufficient grounds for relief. First, Prevezon has made certain factual allegations—including that the Amended Complaint "complete[ly] reli[es] on William Browder" for its recitation of the facts (Br. 41)—that are contested. Resolving these factual disputes is a task for the District Court to address in the first instance. *See United States* v. *Zakhary*, 357 F.3d 186, 193 n.6 (2d Cir. 2004). The need for further fact finding would preclude any relief from this Court even if it was available under the flawed theory that Prevezon presses here.

Second, Prevezon's argument rests entirely on a characterization of the deposition of Special Hyman that does not withstand scrutiny.[26] During the depo-

---

[26] Beyond the agent's deposition, Prevezon points only to comments Government counsel made at a court conference about not having a "great deal" of information about the particulars of the defendants' mental states and hoping to learn more in discovery. (Br. 17, 42). There is no legal significance to these comments, as Government counsel further main-

sition, which remains incomplete, the agent was asked repeatedly to opine on points of law. For example, Special Agent Hyman was asked to identify the Government's "evidence" for several contentions that are the ultimate issues at trial. (Br. 16-17). Prevezon now relies on the answers it received from that line of questioning to show that the agent did not properly verify the complaint. (Br. 41-42). But Prevezon's position is contradicted by the actual testimony the agent provided at the deposition and by the law governing the proper use of deposition testimony.

According to Prevezon, the agent "readily admitted that its investigation did not support many of the allegations" in the Complaint and that the "Government . . . had no evidence" in support of certain allegations. (Br. 16). That is not a fair characterization of the agent's testimony. During the deposition, the agent explained the basis for each of the allegations that Prevezon now claims is unsupported by investigation. (*Compare* Br. 16 (quoting A. 637 for the proposition that the Government "admitted under oath that it had no evidence" that the defendants knew about the $230 million fraud scheme) *with* A. 641 (describing defendants' knowledge of illegal activities); *compare* Br. 16 (quoting A. 621 to contend the Government had no evidence of promotion) *with* A. 625-26 (describing evidence relevant to Defend-

_____

tained that the complaint adequately alleged a guilty mental state (A. 855-56) and was entitled to develop further proof of that element through the discovery process.

ant's intent to promote) *and* A. 632 (clarifying previous answers and saying that there is evidence of a number of matters inquired about previously); *compare* Br. 16-17 (quoting A. 624-25 for the proposition that the Government has no evidence of concealment) *with* A. 626 (describing evidence of concealment) *and* A. 628 (further describing evidence of concealment)). Insofar as there is any ambiguity on these points, it is likely the result of Prevezon's questioning the agent about whether any of the evidence he relied on could be admitted at trial (A. 624-28), an issue that is simply not relevant at this stage of the litigation and could only have served to confuse a non-lawyer witness.

Prevezon's reliance on this testimony is equally misguided as a matter of law. It is not the function of a deposition under Rule 30(b)(6) to wrest legal concessions from a non-lawyer witness, and any legal conclusions drawn under such circumstances bind no one. *See, e.g.*, *AstenJohnson, Inc.* v. *Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009) (explaining that testimony of corporation's Rule 30(b)(6) witness about his interpretation of contract "contained no factual admissions" but was a "legal conclusion" that was "not binding on" corporation). It is also inappropriate to substitute a Rule 30(b)(6) deposition for a contention interrogatory. As one court observed, "This tactic has little to recommend it as a method for trying to lock an opponent into flawed and incomplete contentions and legal theories. A Rule 30(b)(6) deposition produces evidence, not judicial admissions." *First Internet Bank of Indiana* v. *Lawyers Title Ins. Co.*, No. 07 Civ. 869, 2009 WL 2092782, at *4 (S.D. Ind. July 13, 2009); *see also Byrd* v. *Wal-Mart*

*Transp., LLC*, No. CV609-014, 2009 WL 3055303, at *4 & n.7 (S.D. Ga. Sept. 23, 2009) ("While 'contention questions' are not *per se* impermissible during a Rule 30(b)(6) deposition, courts restrict them to written interrogatories where it is more efficient to do so, and asking a lay 30(b)(6) witness to undertake on-the-spot legal analysis in order to respond to contention questions is asking too much, especially since the company's lawyer is far better equipped to formulate full and complete responses for his client to sign."). The agent's lay opinion about whether sufficient admissible evidence supported the government's case has no legal significance here.

Even if it had some legal significance, the agent's deposition remains incomplete: The Government has not yet asked clarifying questions on cross-examination, and the agent has not yet reviewed the final deposition transcript for errors under Rule 30(e)(1). At present, the testimony presents, at best, a one-sided view of the relevant facts, and a possibly misleading one at that. It cannot bear the weight Prevezon places on it. Furthermore, in the time since the deposition, the Government has continued to investigate the claims raised in the Amended Complaint, revealing among other things the sham contractual documentation Bunicon and Elenast submitted to their bank in Moldova, and Prevezon's laundering of an extra $1,108,090.55. (A. 1747). Even if the deposition had some significance at some point in time, it no longer does in light of these recent developments.

## CONCLUSION

**The appeal should be dismissed for lack of appellate jurisdiction or, in the alternative, the Amended Protective Order should be affirmed.**

Dated:     New York, New York
           March 12, 2015

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                          *of America.*

PAUL M. MONTELEONI,
JUSTIN ANDERSON,
      *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 12,164 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: JUSTIN ANDERSON,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X
UNITED STATES OF AMERICA,                          :
                                                                           :         CASE NO  1:13-CV-06326 (TPG)
                              Plaintiff,                              :
                                                                           :         ECF CASE
                      -against-                                     :
                                                                           :
PREVEZON HOLDINGS LTD , *et al.*,          :
                                                                           :
                              Defendants                          :
                                                                           :
------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED VERIFIED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
jmoscow@bakerlaw com
John W  Moscow
Loura L  Alaverdi

BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave ,
Washington, D C  20036
Telephone: (202) 861-1677
Facsimile: (202) 861-1783
mcymrot@bakerlaw com
Mark A  Cymrot

BAKER BOTTS LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
seth taube@bakerbotts com
Seth T  Taube
Richard B  Harper

*Attorneys for Defendants*

Add. 2

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I | INTRODUCTION | | 1 |
| II | BACKGROUND | | 4 |
| | A | FACTUAL BACKGROUND | 4 |
| | | 1   The Defendants | 4 |
| | | 2   Theft of US$230 Million from the Russian Treasury | 4 |
| | | 3   Tracing the Stolen Funds Through 104 Transactions in Five Foreign Countries to the Prevezon 8160 Account | 6 |
| | | 4   Defendants' Alleged Use of Russian Funds to Buy Interests in The Netherlands | 7 |
| | | 5   Mr. Katsyv's Explanation for the Funds Received | 8 |
| | | 6   Description of the Business of Prevezon Holdings | 9 |
| | | 7   The Deficient Claims | 11 |
| | B | THE ORIGINAL VERIFIED COMPLAINT LACKED A FACTUAL BASIS | 11 |
| | | 1   The Government Admitted In Its Fed. R. Civ. P. 30(b)(6) Deposition that There Is No Basis to Allege that Defendants Acted with Knowledge or Intent | 11 |
| | | 2   The Government Relied on Information from William F. Browder, Which It Did Not Verify | 12 |
| | | 3   The Government Cannot Trace Proceeds of the US$230 Million Fraud Scheme to Defendants | 13 |
| | C | PROCEDURAL HISTORY | 13 |
| III | ARGUMENT | | 16 |
| | A | PLEADING STANDARDS | 16 |
| | B | THE GOVERNMENT'S MONEY LAUNDERING CLAIMS ARE BARRED BECAUSE THEY REQUIRE EXTRATERRITORIAL APPLICATION OF THE WIRE FRAUD STATUTE | 18 |
| | C | THE GOVERNMENT CANNOT SHOW THAT PREVEZON HOLDINGS RECEIVED FUNDS "TRACEABLE" TO FRAUD | 20 |

Add. 3

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | **Page** |
|---|---|---|---|
| D | | THE GOVERNMENT FAILS TO ALLEGE THAT DEFENDANTS LAUNDERED ANY FUNDS THEY RECEIVED | 25 |
| | 1 | The Government Has Not Demonstrated that Tainted Funds Were Invested in New York Real Estate | 25 |
| | 2 | The Government Has Not Sufficiently Alleged Knowledge or Intent to Commit Money Laundering | 28 |
| | 3 | The Government Has Not Shown a Substantial Connection Between Defendants and the Specified Unlawful Activity | 30 |
| E | | THE AMENDED VERIFIED COMPLAINT IS NOT PROPERLY VERIFIED AS REQUIRED BY SUPPLEMENTAL RULE G | 31 |
| IV | | CONCLUSION | 33 |

Add. 4

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Prop's*,
   777 F. Supp. 2d 529 (S.D.N.Y. 2011) .......... 16, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......... 2, 17, 18, 26

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......... 2

*Benzman v. Whitman*,
   523 F.3d 119 (2d Cir. 2008) .......... 18, 29

*Bigio v. Coca-Cola Co.*,
   675 F.3d 163 (2d Cir. 2012) .......... 18

*European Cmty. v. RJR Nabisco, Inc.*,
   764 F.3d 129 (2d Cir. 2014) .......... 19

*Marine Midland Bank, N.A. v. United States*,
   93-0307, 1993 WL 158542 (S.D.N.Y. May 11, 1993) .......... 24

*Morrison v. National Austrialia Bank Ltd.*,
   130 S. Ct. 2869 (2010) .......... 19, 20

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010) .......... 19, 20

*One United States v. White Crystal Covered Bad Tour Glove & Other Michael*
   *Jackson Memorabilia*,
   No. 11-3582, 2012 WL 8455336 (C.D. Cal. Apr. 12, 2012) .......... 21

*Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd.*,
   572 F. App'x. 60 (2d Cir. 2014) .......... 19, 20

*Puerto Rico Ports Auth. v. BARGE KATY-B*,
   427 F.3d 93 (1st Cir. 2005) .......... 17

*Ridge Chrysler Jeep, LLC v. DaimlerChrysler Servs. N. Am. LLC*,
   No. 03-760, 2006 WL 2808158 (N.D. Ill. Sept. 6, 2006) .......... 31, 32

*Saltz v. First Frontier, L.P.*,
   485 F. App'x 461 (2d Cir. 2012) .......... 29

*United States v. $22,173.00 in U.S. Currency*,
   716 F. Supp. 2d 245 (S.D.N.Y. 2010) .......... 17

Add. 5

<u>**TABLE OF AUTHORITIES**</u>
**(continued)**

**Page**

*United States v. $448,342.85,*
    969 F 2d 474 (7th Cir 1992)    27

*United States v. 74.05 Acres of Land,*
    428 F Supp 2d 57, 64 (D Conn 2006)    17

*United States v. All Right, Title and Interest in Real Property and Appurtenances*
    *Thereto Known as 785 St. Nicholas Ave. and 789 St. Nicholas Ave.,*
    983 F 2d 396 (2d Cir 1993)    22

*United States v. Certain Accounts, Together With All Monies On Deposit Therein,*
    795 F Supp 391 (S D Fla 1992)    14, 17, 20, 21

*United States v. Contents of Accounts,*
    629 F 3d 601 (6th Cir 2011)    32

*United States v. Contents of Accounts,*
    No 3:10-cv-228-H, 2010 WL 2556849 (W D Ky June 18, 2010)    32

*United States v. Contents in Account No. 059-644190-69,*
    253 F Supp 2d 789 (D Vt 2003)    21, 22, 27

*United States v. Daccarett,*
    6 F 3d 37 (2d Cir 1993), *superseded by statute*, Civil    16

*United States v. Farrington,*
    58 F App'x 919 (3d Cir 2003)    11

*United States v. Funds Held in the Name or for the Benefit of Wetterer,*
    210 F 3d 96, 110 (2d Cir 2000)    17, 31

*United States v. Gotti,*
    459 F 3d 296 (2d Cir 2006)    25

*United States v. Melrose East Subdivision,*
    357 F 3d 493 (5th Cir 2004)    32

*United States v. Miles,*
    360 F 3d 472 (5th Cir 2004)    30

*United States v. Nicolo,*
    597 F Supp 2d 342 (W D N Y 2009)    27

*United States v. One Tyrannosauraus Bataar Skeleton,*
    No 12-4760 (PKC), 2012 WL 3947563 (S D N Y Sept 7, 2012)    31

- ii -

Add. 6

**TABLE OF AUTHORITIES**
**(continued)**

|  | Page |
|---|---|
| *United States v. Santos,* 20 F 3d 280 (7th Cir  1994) | 11 |
| *United States v. Sokolow,* 91 F 3d 396 (3d Cir  1996) | 11 |
| *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967,* 731 F 3d 189, 196 (2d Cir  2013) ("*Sum of $185,336.07*") | 16, 17 |

**Statutes**

| | |
|---|---|
| 18 U S C  § 981 | 1, 3, 18, 21 |
| 18 U S C  § 983 | *passim* |
| 18 U S C  § 1343 | 19 |
| 18 U S C  § 1956 | 18, 21, 28 |
| 18 U S C  § 1957 | 18, 21, 28 |

**Rules**

| | |
|---|---|
| Fed  R  Civ  P  12(b)(6) | 17 |
| Supp  R  E | 16 |
| Supp  R  G | 3, 16, 21, 31 |

**Other Authorities**

| | |
|---|---|
| David B  Smith, Prosecution & Defense of Forfeiture Cases § 915 01[1][c] n 36 (2013) | 25 |

# Add. 7

## I.    INTRODUCTION

Defendants Prevezon Holdings Ltd  ("Prevezon Holdings") and its eight affiliates[1] have been subject to a protective order restraining their properties for 16 months based upon a Verified Complaint and now an Amended Verified Complaint that does not allege that Defendants did anything culpable to satisfy the most basic elements of forfeiture law, 18 U S C §§ 981, *et seq.*, and the Money Laundering Control Act, 18 U S C  §§ 1956 & 1957   Each of the Claims must be dismissed

The Amended Verified Complaint tells two stories: one story about a US$230 million Russian tax refund fraud, and another separate story about the Prevezon Defendants' legitimate real estate business   The Amended Verified Complaint fails to connect the two   The Government's allegations can be divided into four parts:

The first section tells a graphic and disturbing story about the US$230 million tax refund fraud from the Russian Treasury by the so-called "Organization" and the death of Mr  Sergei Magnitsky  Am  Compl  ¶¶ 18-82   Those allegations are irrelevant to Defendants, who are not mentioned once, and are highly prejudicial, designed to inflame the reader and to create prejudice against Defendants   The Government has admitted that Defendants were not members of the Organization, did not know about the Organization or the fraud, and played no role in Mr  Magnitsky's death

The next section – also making no mention of Defendants' conduct − contains highly attenuated allegations purporting to trace US$1,965,444 55 of the US$230,000,000 defrauded funds through 104 transactions at nine (9) banks across five (5) countries, and into a Zurich bank

---

[1] The eight New York affiliates, together with Prevezon Holdings, are referred to as the "Prevezon Defendants" and with Defendants Ferencoi Investments Ltd  ("Ferencoi") and Kolevins, Ltd  ("Kolevins"), they are referred to as "Defendants "  Ferencoi and Kolevins have filed separate motions to dismiss, Dkt  No  201, but incorporate the arguments in this motion by reference

Add. 8

account of Prevezon Holdings  Am  Compl ¶¶ 83-100, 114-123   The Government does not allege that any member of the Organization directed funds to Defendants; instead, the entire case turns on the improper use of accounting assumptions   The tracing is flawed in numerous ways   For example, Exhibit B shows a transfer of 1,185 million Rubles, of which 487 6 million Rubles (equivalent of US$19 5 million) were untainted funds   The Government proffers no explanation for asserting that the US$1 96 million received by Prevezon came from tainted rather than untainted funds   The sole link between the claimed Russian refund fraud scheme and Defendants, thus, is a fatally defective tracing exercise

The Court should focus its attention particularly on the third section of the Amended Verified Complaint, consisting of only 13 paragraphs that mention Defendants' conduct but do not identify any as wrongful   *Id.* ¶¶ 101-113   The Prevezon Defendants are an investment company and its affiliates, which were primarily focused on investing funds of their owner, Denis Katsyv, in real estate   Before Mr  Katsyv purchased Prevezon Holdings, it accepted funds from one client, Mr  Petrov, for the purpose of investing those funds, and invested those funds (including the purported US$1 96 million in tainted funds) in The Netherlands where the Government seized the funds in February 2013, after the original Verified Complaint was filed   Twenty-one months later, the Prevezon Defendants began to invest in eight condominiums in New York in ordinary and regular transactions, but the Government traces no tainted funds into these New York investments   This is the entire story the Amended Verified Complaint tells about Defendants

The fourth section contains seven Claims that should explain how these factual allegations present a case under United States law but do no more than quote from the underlying statutes in violation of the Government's pleading requirements under *Twombly* and *Iqbal*

2

Add. 9

Each of the Claims is founded upon allegations of knowledge and intent even though the Government has admitted that it has no information suggesting Defendants knew about or intended to promote or conceal the Russian tax refund fraud or any other crime

Based upon these wholly defective allegations, the Government has put the Prevezon Defendants out of business, seizing "any and all assets" amounting to approximately US$15 million   In a civil forfeiture action, the Government must meet the heightened pleading standards required by 18 U S C  § 981(a)(1)(A), § 983(j), and Rule G of the Supplementary Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp  R "), which require the complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial "  Supp  R  G(2)(f)   However, the Amended Verified Complaint is based upon three flawed factual allegations, each alone fatal to the case: the Government (1) has not traced any tainted funds into Prevezon Holdings' account in Zurich; (2) has not traced any tainted funds into the eight Prevezon affiliates in New York; and (3) has not alleged facts sufficient for a finding of knowledge and intent, which are fundamental to each of the Claims

The Claims are also legally deficient for at least four reasons: (1) the Government has not identified a Specified Unlawful Activity ("SUA") actionable in the United States; (2) the Government has not alleged facts demonstrating that any funds "traceable to" Defendants were derived from the fraudulent transaction; (3) the Government has not alleged facts demonstrating that the Defendants laundered any funds they received; and (4) the Government's verification, required by Supp  R  G for a forfeiture action, is inaccurate and misleading as revealed by the Governments admissions in its Fed  R  Civ  P  30(b)(6) testimony

3

This injustice should be remedied immediately by dismissal of the Amended Verified Complaint

## II.    BACKGROUND

### A.    FACTUAL BACKGROUND

This factual background, unless otherwise indicated, is taken from the Government's allegations in the Amended Verified Complaint, which are presumed to be true for the purpose of this motion only  Defendants strongly contest these allegations and deny any wrongdoing

#### 1.    The Defendants

Defendants are a group of companies currently engaged in real estate investments  Am Compl ¶¶ 103, 108-109  Defendant Prevezon Holdings is a foreign holding company organized under the laws of Cyprus that invested in real estate projects in The Netherlands and New York  *Id.* ¶¶ 7, 103, 124; Claim for Property, Dkt  No  204  Mr  Katsyv, a Russian citizen, owns Prevezon Holdings and runs the company along with Alexander Litvak and Timofey Krit, the former owner and now a director  Am  Compl  ¶¶ 9-11  Prevezon Holdings acquired a 30% interest in a series of Dutch companies held in partnership with AFI Europe, a major international real estate company [2]  Prevezon Holdings also owns the eight Defendant Prevezon companies, each a New York limited liability company that held separate real estate investments in New York  *Id.* ¶¶ 11, 124-136

#### 2.    Theft of US$230 Million from the Russian Treasury

On December 26, 2007, a Russian tax office allegedly transferred the equivalent of US$230 million (in Rubles) to corporate accounts in the names of three affiliates of Hermitage Capital at two Russian banks, Universal Savings Banks ("USB") and Intercommerz  *Id.* ¶ 77.

---

[2] According to its webpage, API Europe, N V  is a major real estate developer with projects in eight countries, including Germany, the Czech Republic, Latvia, and Poland  *See* AFI-Europe, http://afieurope eu/ Aboutus/Pages/Company aspx (last visited January 12, 2015)

The transfers were part of an "elaborate" scheme orchestrated by a criminal "Organization" to defraud the Russian Treasury by creating fictitious tax refunds  *Id.* ¶¶ 2, 18-21, 44-45  In or about November 2008, an accountant investigating the fraud, Sergei Magnitsky, was arrested and a year later, in November 17, 2009, died of heart failure while still in pretrial detention  *Id.* ¶¶ 17, 56, 59, 62, 64   To put the internal conflict within the Amended Verified Complaint into context, the Government has admitted on numerous occasions that Defendants are not alleged:

- To be members of the Organization, to know any members of the Organization, to have participated in any way in the Russian tax refund fraud, or even to have known about the Organization or the fraud; or

- To have had anything to do with Mr  Magnitsky's detention or death, or even to have known about it

   The Government has admitted in two separate filings and at two separate court hearings that Defendants had nothing to do with the alleged "Organization" or the Russian tax refund fraud  *See* Dkt  No  47 at 5 n 3; Dkt  No  58 at 5 n 3; Hr'g Tr  Feb  14, 2014, 47:12-15; Hr'g Tr  Mar  4, 2014, 12:14-16   At the February 14, 2014 hearing, AUSA Paul Monteleoni had the following exchange with the Court:

> **The Court:** Were these defendants part of – I mean were they part of that group that you're talking about?
>
> **AUSA Monteleoni:**   We do not definitely allege that they are in the complaint

Hr'g Tr  Feb  14, 2014, 47:12-15  At the March 4, 2014, hearing, the Government had this further exchange with the Court:

> **The Court:** I don't understand the government to claim that the defendants participated in or engineered or conceived of or anything like that the original tax fraud on the Russian government   Can the government attorney respond? Am I right?
>
> **AUSA Christine Magdo:**  That's correct, your Honor

Hr'g Tr  Mar  4, 2014, 8:1-5  Even after these admissions and more than a year to further investigate, the Amended Verified Complaint continues to make allegations about this theft and the notorious death without connecting them to Defendants in any way [3]

### 3. Tracing the Stolen Funds Through 104 Transactions in Five Foreign Countries to the Prevezon 8160 Account

Following the transfer of the US$230 million from the Russian Treasury, the Organization allegedly "engaged in a complicated series of transactions" to launder the funds  Am  Compl  ¶ 75  As reflected in Exhibit B to the Amended Verified Complaint, the Government purports to trace US$1 96 million from the Russian Treasury in 104 transfers through nine (9) banks across five (5) countries: Russia, Moldova, Estonia, and the British Virgin Islands into Switzerland   Except for one wire transfer, all of the wire transfers took place between banks outside of the United States   *See generally* Am  Compl  ¶¶ 77-102, 114-123 & Ex  B   That one transfer took place on February 5, 2008, when $726,000 was allegedly routed through the Southern District of New York from the account in Moldova of a Moldavian company, Bunicon-Impex SRL ("Bunicon"), to a Latvian bank, eventually reaching a third party unrelated to Defendants   *Id.* ¶¶ 97-98   This one transfer is not included on Exhibit B and is not alleged to have ever reached Defendants   The Amended Verified Complaint does not:

- Identify a person(s) who masterminded the transfers or directed funds to Defendants;

- Disclose the basis for this tracing or follow the basic guidelines of *Banco Cafetero Panama*; or

---

[3] The allegations regarding Magnitsky's death, in addition to being wholly immaterial to the claims against Defendants, are extraordinarily prejudicial, describing at great length Magnitsky's arrest, detention, and death, including allegations that he was "beaten by 8 guards with rubber batons on the last day of his life," Am  Compl  ¶ 66, and that an ambulance crew "was deliberately kept outside of his cell for one hour and 18 minutes until he was dead " *Id.* The presence of such allegations in the Amended Verified Complaint is particularly outrageous as the Government has admitted that Defendants had nothing to do with these alleged events  Dkt  No  47 at 5 n 3  If this case proceeds to trial, Defendants intend to move to exclude evidence and argument concerning these scandalous allegations

- Allege that Defendants knew about any of the transfers, any of the businesses or the banks named in the tracing analysis, or the unnamed persons who ordered the transfers

**4.     Defendants' Alleged Use of Russian Funds to Buy Interests in The Netherlands**

The Amended Verified Complaint's factual allegations section finally mentions Defendants on page 38, paragraph 101   In February 2008, Defendants are alleged to have received US$1 96 million of the allegedly stolen funds into Prevezon Holdings' account in Switzerland ("Prevezon 8160 Account"), but the Amended Verified Complaint never distinguishes these allegedly tainted funds from the US$19 5 million (487 6 Rubles) in untainted funds going through the same accounts   The many deficiencies in the tracing allegations are set forth below   *See infra.* at Part III(C) [4]

As alleged in the Amended Verified Complaint, the US$1 96 million never reached property in the United States, which would be the only way to bring the funds within the jurisdiction of this Court   In May and June of 2008, Prevezon Holdings "converted millions of dollars" in the Prevezon 8160 Account into Euros in the Prevezon 8170 Account and transferred "over 3 million euros to AFI Europe  N V " for the purpose of purchasing interests in Dutch companies that held property interests in Germany   Am  Compl  ¶ 103   The Government's purported tracing stops at the Dutch companies with the exception of one vague allegation that on an unknown date an unspecified amount of funds was transferred from AFI Europe to the Prevezon 8170 Account   *Id.* ¶ 125   The Amended Verified Complaint provides no basis for linking this transfer to funds from the Russian Treasury because the purportedly tainted funds had been invested in interests in Dutch companies that Prevezon Holdings still held   In 2013, AFI Europe purchased Prevezon Holdings' interest in the Dutch companies but never transmitted

---

[4] The Government sought confirmation of its tracing from the Russian Federation through an MLAT request, received a response, but has refused to provide Defendants with the response  Without this sole alleged link between Defendants and the Russian fraud scheme, there would be no case

payment to Prevezon Holdings; instead, the funds were frozen by a Dutch court pursuant to an

MLAT request from the United States.[5] *Id.* ¶ 136

### 5.     Mr. Katsyv's Explanation for the Funds Received

The Amended Verified Complaint even alleges a wholly innocent explanation for

Defendants' conduct. When a news reporter approached Mr. Katsyv asking about the February

2008 transfers, Mr. Katsyv did not react like a criminal participant in a massive fraud scheme

might. Instead Mr. Katsyv "undertook a full review" of the source and use of the funds

transferred, which occurred before he became owner of Prevezon Holdings. *Id.* ¶ 108. His

representative – designated Representative-1 as if he were a confidential informant – publicly

reported that the February 2008 transfers had been made on behalf of a third party investor, Mr.

Petrov, who was a friend of Mr. Krit's, the prior owner and still a Prevezon Holdings director.

*Id.* Mr. Petrov agreed to transfer the funds to Prevezon Holdings for the purpose of jointly

developing "a business based on investments in and management of property." *Id.* ¶ 108.

Representative-1 reported that funds were invested in New York real estate. *Id.* ¶ 124.

- Representative-1's statement about the source of the funds for the New York investments is inconsistent with the Government's tracing of Russian Treasury funds set forth just paragraphs before, but the Amended Verified Complaint makes no effort to reconcile the inconsistency;

- The Government presents no facts challenging Mr. Katsyv's statement about the third party investor and never attempted to interview Mr. Katsyv or Representative-1 prior to filing the original Verified Complaint.

As the Amended Verified Complaint acknowledges, the purchases of New York real

estate started 21 months after the US$1.96 million was deposited into the Prevezon 8160

Account (between November 2009 and September 2012) and 16 months after Prevezon Holdings

spent those funds to purchase interests in Dutch companies. *Id.* ¶ 103. The Amended Verified

---

[5] The Government also is withholding this MLAT request from Defendants even though its representations to the Dutch government would appear to be inconsistent with its jurisdictional allegations in this case.

Complaint simply alleges that six of Defendants' New York properties were purchased, in whole or in part, with funds from the Prevezon 8160 Account totaling approximately $7 million, as if the account were forever tainted by once allegedly holding Russian Treasury funds  *Id.* ¶¶ 124-29   But the Amended Verified Complaint also alleges that two Defendant properties (purchased by Prevezon Soho and Prevezon Alexander) were acquired entirely with funds from sources other than the Prevezon 8160 Account   *Id* ¶ 127, 130   No Treasury funds are traced to these companies, although their assets are restrained in the Amended Protective Order   Dkt  No  173 ¶ 4   As of the date of the filing of the original Verified Complaint, all but two of the eight properties were still held by Defendants   The properties held by Defendants Prevezon 1810, LLC and Prevezon Soho USA, LLC ("Prevezon Soho") were sold in 2013 prior to the filing of the Complaint   *Id.* ¶¶125c, 127a

The Amended Verified Complaint has no allegations that:

- Attempt to rebut Mr  Katsyv's explanation, Am  Compl  ¶ 108, that the funds came from an independent investor, and, thus, Prevezon Holdings had nothing at all to do with the alleged Russian fraud;

- Explain why the US$1 96 million transferred into the Prevezon 8160 Account had to be stolen funds when the Amended Verified Complaint alleges that the Bank Krainiy Sever Account had transferred at least the equivalent of US$19 5 million in untainted funds; or

- Explain how the Government connects the allegedly stolen funds to any New York real estate

By contrast, the real estate business depicted in the Amended Verified Complaint conducts transactions in an ordinary and legal fashion, including collecting rents, paying taxes, employing people, and providing housing or offices for numerous tenants

**6.        Description of the Business of Prevezon Holdings**

The Amended Verified Complaint describes the business of Prevezon Holdings as an ordinary real estate investment business   It bought real estate, held it, and sold it at a profit

Add. 16

There are no allegations of false statements, false books and records, or any other irregularities  Nowhere in the Amended Verified Complaint is there an allegation that any of Messrs  Katsyv, Krit, Litvak, or Petrov engaged in any unlawful conduct

The Amended Verified Complaint makes much of the US$50,000 purchase price paid by Mr  Katsyv for Prevezon Holdings when US$2 million allegedly was in the Prevezon 8160 Account  *Id.* ¶ 106   But the Amended Verified Complaint provides its own explanation — the funds in the account were those invested by Mr  Petrov  *Id.* ¶ 108   These allegations are entirely consistent with Mr  Katsyv's explanation: an investment company would have a liability to offset the assets in the bank account

The Amended Verified Complaint also attempts to discredit the explanation by Mr Katsyv's representative of funds transferred into the Prevezon 8160 Account with the allegation that the transfers were identified in bank records as "prepayment for sanitary equipment or for automotive spare parts "  *Id.* ¶ 123   The Amended Verified Complaint further alleges that Bunicon had a "purported contract" "purportedly signed by an unnamed representative of Prevezon Holdings" in connection with the $410,000 February 6, 2008, transfer and that Elenast had a "purported invoice" "purportedly signed by an unnamed director of Prevezon Holdings" in connection with the $447,354 February 13, 2008 transfer  *Id*  ¶¶ 111-12   There is no allegation that Prevezon Holdings had anything to do with these descriptions: the entries were made by the bank in Moldova and the two Moldavian companies   In any case, Mr  Katsyv did not own the company at the time, and these facts in no way associate Prevezon Holdings or Mr  Katsyv with the Russian tax refund fraud   In fact, the Government has admitted in Court and under oath that

10

Add. 17

it knows little about the knowledge or intent of Defendants or their principal, an essential element of each Claim [6]

### 7.   The Deficient Claims

The Amended Verified Complaint concludes by asserting seven civil Claims, which allege that Defendants engaged in money laundering by concealing or knowingly transferring the stolen proceeds from the Russian Treasury by the Organization  *Id.* ¶¶ 137-71   Each Claim merely quotes the relevant statutory language without identifying factual allegations that allegedly support the elements of the Claims, for instance what constitutes an SUA or what facts provide a basis for the *scienter* allegations

### B.   THE ORIGINAL VERIFIED COMPLAINT LACKED A FACTUAL BASIS

On March 3, 2014, Defendants conducted a Fed  R  Civ  P  30(b)(6) deposition of the Government   The Government designated Special Agent Todd Hyman of the Department of Homeland Security as its witness   The Government readily admitted that its investigation did not support many of the allegations in the original Verified Complaint, which are repeated in the Amended Verified Complaint

### 1.   The Government Admitted In Its Fed. R. Civ. P. 30(b)(6) Deposition that There Is No Basis to Allege that Defendants Acted with Knowledge or Intent

Each of the Claims alleges that Defendants had knowledge of the alleged fraud and intended to promote or conceal it   However, the Government admitted that it had no evidence that:

---

[6] The Government now seeks to smear Defendants with a prejudicial, irrelevant, and highly misleading allegation regarding a money laundering proceeding in Israel  Am  Compl ¶ 113  The Amended Verified Complaint omits the fact that the Israeli court found that no money laundering had occurred  The Government's excuse for this allegation – knowledge of Israeli money laundering laws – is irrelevant and inadmissible  *See United States v. Sokolow*, 91 F 3d 396, 408–09 (3d Cir  1996); *accord United States v. Farrington*, 58 F  App'x 919, 924 (3d Cir  2003); *United States v. Santos*, 20 F 3d 280, 284 n 3 (7th Cir  1994)  If this lawsuit continues, Defendants will seek to have this information excluded also

- "Dennis Katsyv, Timofey Krit or Alex Litvak knew that there was a US$230 million fraud as of    June 2008 "  Rule 30(b)(6) Deposition of the Government (Gov't Dep )[7] at 150:8–14

- Defendants "intended to promote the organization" or that they "intended to promote and perpetuate the organization's acts of fraud, corruption and money laundering "  *Id.* at 134:13–21

- Defendants "knew that the financial transactions were designed in whole or part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the $230 million fraud scheme "  *Id.* at 137:13–138:5

- The Government knows little about the knowledge or intent of Defendants or their principal and needs discovery to provide evidence of this essential element of each Claim   Hr'g Tr  Feb  14, 2014 at 45:23-46:19 (evidence going to scienter is "something that we hope that discovery will reveal ")

Despite these admissions, the same allegations are found in the Amended Verified Complaint without any additional facts to supports its conclusory allegations of knowledge and intent

### 2.    The Government Relied on Information from William F. Browder, Which It Did Not Verify

William F  Browder, principal owner of Hermitage Capital Management ("Hermitage Capital"), is the Government's primary source of information for this case   Gov't Dep  at 53:6–55:4   The Government's entire investigation involved interviewing Browder—who was previously convicted of fraud in Russia, and who was not in Russia during the time of the events in the Amended Verified Complaint; interviewing Browder's associates at Hermitage Capital; and reviewing purported bank records and charts provided by Browder or obtained from public sources  *Id.* at 16:17–17:4, 19:20–21:10, 31:4–13, 107:14-108:8   The Government admitted that it did not interview any witnesses who have direct knowledge of any of the facts in the original Verified Complaint  *Id.* at 19:8–19   The Government made no attempt to confirm Browder's information independently  *Id.* at 47:22-48:8

---

[7] A true and correct copy of the Gov't Dep  is attached as Exhibit 1 to the Declaration of Mark A  Cymrot in Support of Defendants' Motion to Dismiss the Amended Verified Complaint, filed concurrently herewith

### 3.   The Government Cannot Trace Proceeds of the US$230 Million Fraud Scheme to Defendants

The tracing alleged in Exhibit B is based solely on documents that Browder said were bank records and charts his associates derived from these purported records. *Id.* at 32:19–33:2.

The Government has admitted that:

- The purported records cannot be authenticated because Browder refused to tell the Government where he got them. *Id.* at 177:5–16.

- The Government has not obtained copies of the actual records from the banks themselves. *Id.* at 31:4–13.

- The Government has no witnesses to support these tracing allegations. In its investigation the Government did not identify the individual(s) who directed the transfer of funds to the Prevezon 8160 Account. *Id.* at 91:9–92:8.

- As the Government admitted, every transfer on Exhibit B "is based on copies that are not authenticated, of records that are incomplete, based on an accounting assumption." *Id.* at 92:4–8. The Government's Fed. R. Civ. P. 30(b)(6) witness admitted that his work product would have been more "comprehensive." *Id.* at 39:13.

Even the Amended Verified Complaint admits that the Russian government has already stated that it cannot trace the funds from the US$230 million fraud scheme because some of the bank records were destroyed in a fire. Am. Compl. ¶ 82. The Government cites to these records in Exhibit B as though they existed, while denying possession of them.

### C.   PROCEDURAL HISTORY

On September 10, 2013, more than five years after the Prevezon 8160 account allegedly received US$1.96 in tainted funds, the Government filed a Verified Complaint against Defendants *in personam*, as well as against *in rem* properties allegedly associated with the Defendants. Dkt. No. 1. The Government sought to restrain and forfeit any and all assets worldwide specified and not specified of eleven separate companies. *Id.* The Government's Application for the *ex parte* Protective Order did not disclose that the Protective Order would restrain properties worldwide, such as a hotel in Russia and land in Cyprus, and provided no

legal basis for such an overbroad restraint   When Defendants' counsel informed the Court at the

January 7, 2014, hearing that the Protective Order restrained foreign businesses, the Court said:

> I believe there is a strong possibility that some of what I have
> restrained is legitimate business   I do not know the facts about
> that I've said that     I do not want to restrain legitimate business
> activity   And I'm concerned that I'm doing that to some extent
> now

Hr'g Tr  Jan  7, 2014, 41:6-15   The Application also made no reference to a foreign seizure or to

the allegations that the allegedly tainted funds were transferred to and stayed in The Netherlands

Instead, the Application represented that Defendants used the $857,354, "commingled with other

funds," to purchase multiple properties in New York   *Compare* Ex Parte Application for a Post-

Complaint Protective Order Pursuant to 18 U S C § 983(j)(1), September 10, 2013, at 8, *with*

Am  Compl  ¶ 103   Because (among other deficiencies) the scope of the original Verified

Complaint and the corresponding Protective Order were extraordinary and unlawful, Defendants

sought to vacate the Protective Order and dismiss the claims against them   Dkt  Nos  37, 44, 49 [8]

When Defendants noticed the deposition of the Special Agent that verified the original Verified

Complaint, the Court set aside that notice on February 14, 2014  Hr'g Tr  Feb  14, 2014, at 4:12-

16   Defendants thereafter conducted a Fed  R  Civ  P  30(b)(6) deposition of the Government,

which revealed additional serious issues with the verification and the original Verified

Complaint   *See supra* Part II(B)

Defendants withdrew their omnibus motion to dismiss on February 13, 2014, in order to

get an early trial, which the court scheduled for March 31, 2014   Dkt  Nos  67, 70   At that point,

the motion to vacate the protective order was pending and undecided   On February 18, 2014, the

Government requested that the Court continue the March 31, 2014 trial date to allow the

Government to file an amended complaint   *See* Monteleoni Letter to Hon  Thomas P  Griesa,

---

[8] Ferencoi and Kolevins filed a separate motion to dismiss for lack of jurisdiction  Dkt  No  45

14

Add. 21

Feb  18, 2014   On March 4, 2014, the Government submitted another letter informing the Court that Browder and other Hermitage representatives "will be key witnesses" in the case and asking the Court to address Browder and Hermitage's claim of a prior-client conflict against Defendants' counsel, Baker & Hostetler LLP   Dkt  No  106-1   At the March 4, 2014 hearing, the Court stated:  "as far as I am concerned, Baker Hostetler is properly representing its clients in this case, and that's the way we'll leave it   If there's some other development that changes things, well, that's something that I do not know anything about right now "  Dkt  No  77, 29:20-24   However, the Court continued the trial date indefinitely   Thereafter, on March 21, 2014, Defendants renewed their motions for dismissal of the Complaint and for an order denying leave to file the proposed amended complaint   Dkt  No  79   A separate motion to dismiss the claims against Defendants Kolevins and Ferencoi remained pending   *Id.*   That motion was never considered, granted, or denied

Based on the Government's identification of Hermitage and Browder as its key witnesses, Defendants issued subpoenas to Browder, one of his companies, and his agents   The deponents filed motions to quash the subpoenas   Dkt  No  111   The Government supported the motions asserting Browder was entitled to its work product and law enforcement privileges *Hermitage Global Partners LP et al v. Prevezon Holdings Ltd., et al.*, No  1:14-mc-00318-TPG, Dkt  No  1-14   At a hearing on September 18, 2014, the Court did not address Defendants' motion to vacate the protective order but instead granted Browder leave to file a motion to disqualify Baker & Hostetler LLP   The Court stayed the case pending resolution of the motion to disqualify counsel, which the deponents later filed   Dkt  No  124   The Government supported the motion to disqualify counsel   Dkt  No  141   After two lengthy hearings on October 14 and

October 23, 2014, the Court denied Hermitage and Browder's motion to disqualify counsel   Dkt  No  158   Briefing on the motion to quash continues

On October 27, 2014, Defendants again requested a hearing on their pending motion to vacate and the Court set a hearing for November 5, 2014   Dkt  Nos  162 & 178   On October 31, 2014, the Government requested leave to file a new Amended Verified Complaint and also submitted an amended protective order   Dkt  No  167   At the November 5, 2014, hearing, the Court granted the Government leave to file its Amended Verified Complaint and entered the Government's amended protective order, which limited the properties subject to restraint to US$15 million in identified property and funds   The Court denied Defendants' motion to vacate the original protective order   Dkt  No  173   The Government filed the Amended Verified Complaint that same day   Dkt  No  174   Doing so mooted the motions to dismiss, including the motion by Defendants Kolevins and Ferencoi that was filed eleven months earlier

### III.   ARGUMENT

### A.   PLEADING STANDARDS

Civil forfeiture is a "drastic" remedy requiring a heightened pleading standard that the Government has not met in the Amended Verified Complaint   *United States v. Daccarett*, 6 F 3d 37, 47 (2d Cir  1993), *superseded by statute*, Civil Asset Forfeiture Reform Act (CAFRA), Pub L  No  106–185, 114 Stat  202, *as recognized in United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Account L7N01967*, 731 F 3d 189, 196 (2d Cir  2013) ("*Sum of $185,336.07*")   The Government asserts claims against Defendants *in rem* (the First Claim) and *in personam* (the Second through Seventh Claims), all based on alleged violations of the money laundering statutes   The assertion of these claims imposes a heightened pleading standard on the Government.   *See In re 650 Fifth Ave. & Related Prop's*, 777 F  Supp  2d 529, 542 (S D N Y  2011); *see also* 18 U S C  § 983(a)(3)(A); Supp  R  E(2)(A) & G(2) (stating that

the complaint in a forfeiture action must, among other things, be verified, state the grounds for subject-matter jurisdiction, describe the property with reasonable particularity, and state sufficiently detailed facts to support a reasonable belief that the government will be able to meet it burden of proof at trial)

Under this heightened standard, "the Government's complaint must assert specific facts supporting an inference that the property is subject to forfeiture " *United States v. $22,173.00 in U.S. Currency*, 716 F  Supp  2d 245, 248 (S D N Y  2010) (marks and citation omitted) [9]  These pleading requirements are not mere formalities; they provide constitutionally required due process and are in place so that the United States cannot, without sufficient basis, take advantage of "the unique and drastic remedies" that are available in forfeiture proceedings   *Puerto Rico Ports Auth. v. BARGE KATY-B*, 427 F 3d 93, 105 (1st Cir  2005); *see also United States v. Certain Accounts, Together with all Monies on Deposit Therein*, 795 F  Supp  391, 394 (S D Fla  1992)

On a motion to dismiss under Fed  R  Civ  P  12(b)(6), a court must also assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face '" *Ashcroft v. Iqbal*, 556 U S  662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U S  544, 570 (2007))   A court need not credit "a legal conclusion couched as a factual allegation " *Id.*  The plausibility standard is met only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[9] The Civil Asset Forfeiture Reform Act ("CAFRA") was enacted to remedy the overly broad scope of the Government's authority to bring civil forfeiture cases  *See* Sum *of $185,336.07*, 731 F 3d at 196  The civil forfeiture laws are subject to abuse because the Government has a direct pecuniary interest in the proceedings  *See United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F 3d 96, 110 (2d Cir  2000) (recognizing that "forfeited funds are kept by the Department of Justice as a supplement to its budget "), *superseded by statute*, CAFRA, Pub  L  No  106–185, 114 Stat  202 (2000), *as recognized in United States v. 74.05 Acres of Land*, 428 F Supp  2d 57, 64 (D  Conn  2006); *see also* H R  Rep  No  106-192, at 6-11 (2000) (quoting Second Circuit opinion that expressed concern about "the government's increasing and virtually unchecked use of the civil forfeiture statutes," detailing examples of government "abuses" of civil forfeiture law, and stating that CAFRA is "designed to make federal civil forfeiture procedures fair to property owners")

Add. 24

misconduct alleged " *Id.*; *see also Bigio v. Coca-Cola Co.*, 675 F 3d 163, 173 (2d Cir  2012)

"[A] bare allegation       is not plausible in the absence of some supporting facts " *Benzman v.*

*Whitman*, 523 F 3d 119, 129 (2d Cir  2008)

To state a claim for forfeiture or civil money penalties, the Government must show that

the property it seeks to forfeit was "involved in" or "traceable to" a money laundering

transaction in violation of 18 U S C  §§ 1956 or 1957  *See* 18 U S C  § 981(a)(1)(A)   For each

Claim, the Government must identify a "specified unlawful activity" ("SUA") under section

1956, which it has not done in any of its Claims   A violation of these statutes occurs when the

defendant conducts a financial transaction:

- "With the *intent to promote* the carrying on of specified unlawful activity," 18 U S C  § 1956(a)(1)(A)(i);

- "*Knowing* that the transaction is designed in whole or in part -- (i) to *conceal or disguise* the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U S C  § 1956(a)(1)(B)(i) (emphasis added); or

- "*Knowingly* engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity "  18 U S C  § 1957(a) (emphasis added)

The Government has admitted it lacks sufficient facts to satisfy this burden; it hopes to find

evidence of Defendants' knowledge and intent through discovery   *See infra* Part II(B)(1)   The

Government's speculation is not an adequate basis for a complaint, particularly one that seizes

US$15 million of Defendants' property and puts them out of business

**B.   THE GOVERNMENT'S MONEY LAUNDERING CLAIMS ARE BARRED BECAUSE THEY REQUIRE EXTRATERRITORIAL APPLICATION OF THE WIRE FRAUD STATUTE**

Each of the Government's Claims requires the Government to prove that Defendants

engaged in, or conspired to engage in, money laundering   Am  Compl  ¶¶ 138, 146, 151, 155,

158, 161, & 165   In turn, each money laundering allegation requires the Government to prove an

18

SUA  Am  Compl  ¶¶ 141, 147, 151, 155, 158, 161, & 166   None of the Claims identify an SUA

with specificity; however, in prior briefing, the Government has identified wire fraud as the

applicable SUA   *See* 18 U S C  § 1343; Dkt  No  88 at 16-17; Hr'g Tr  Jan  7, 2014, 10:4-9

("The specified unlawful activity is wire fraud ")   The Amended Verified Complaint, thus, must

fail because the Second Circuit has held that the wire fraud law statutes do not have

extraterritorial effect, and this case involves only foreign schemes to defraud

In *Morrison v. National Austrialia Bank Ltd.*, the Supreme Court held that U S  federal

statutes are presumed not to apply to foreign conduct, but only to domestic conduct   130 S Ct

2869, 2877 (2010)   That presumption is only defeated when Congress has specifically indicated

its intention that the statute apply extraterritorially   *Norex Petroleum Ltd. v. Access Indus., Inc* ,

631 F 3d 29, 31 (2d Cir  2010) (citing *Morrison*, 130 S  Ct  at 2877-78) ("absent an express

intention by Congress of extraterritorial effect, a statute applies only domestically ")   Applying

*Morrison*, the Second Circuit has held that the extraterritorial reach of a statute that incorporates

a predicate offense is limited to the extraterritorial reach of the statute criminalizing the

underlying predicate offense   *European Cmty. v. RJR Nabisco, Inc.*, 764 F 3d 129, 139 (2d Cir

2014)   Further, the Second Circuit has held that the wire fraud statute, 18 U S C  § 1343, does

"not indicate a congressional intent that the statute[] apply extraterritorially" and therefore only

applies to domestic, but not to foreign, schemes   *Id.* at 141; *Petroleos Mexicanos v. SK Eng'g &

Constr. Co. Ltd.*, 572 F  App'x  60, 61  (2d Cir  2014) (summary order)

Here, the Government's money laundering claims and forfeiture claim apply the wire

fraud statute to a wholly foreign scheme   *See* Am  Comp  ¶¶ 137-71  The US$230 million

Russian fraud allegedly was planned and executed in Russia and neighboring states, the allegedly

tainted funds were transferred through multiple layers of banks in Russia and other foreign

19

Add. 26

locales, the witnesses and records are foreign, and the Defendants are Russian-owned  The sole connection the Government has alleged to the United States is the routing of one wire transfer from a Moldavian bank account to a Latvian bank account that was routed through New York  Am  Compl ¶ 97; Dkt  No  58, Gov't Opp  to Motion to Dismiss, at 12 (identifying "use of the United States wires" alleged in ¶ 97 as the act underlying the Organization's SUA of wire fraud)  Notably, that transfer had nothing to do with Defendants; instead it was allegedly part of a chain that traced Russian funds to a third party with no relationship to Defendants  *See infra* Part II(B)(3)

The lone pleaded contact with the United States is wholly insufficient to render the US$230 million fraud scheme "domestic "  A single wire transfer through New York does not convert a foreign scheme into a domestic wire fraud  *See Norex*, 631 F 3d at 33 (holding "numerous acts in the United States" to be "insufficient to support extraterritorial application of the RICO statute" with a predicate offense of wire fraud); *Petroleos Mexicanos*, 572 F  App'x at 61 (finding the "allegations of domestic conduct" – which included obtaining financing in the U S , sending invoices to a U S  bank for payment, and a U S  bank issuing payment – to be "simply insufficient to sustain RICO jurisdiction"); *cf. Morrison*, 130 S  Ct  at 2874 ("It is a rare case of prohibited extraterritorial application that lacks *all* contact with United States territory ")

Because the alleged US$230 million Russian fraud was foreign, the Government's Amended Verified Complaint must be dismissed

**C.    THE GOVERNMENT CANNOT SHOW THAT PREVEZON HOLDINGS RECEIVED FUNDS "TRACEABLE" TO FRAUD**

All of the Government's Claims rely upon money laundering offenses that require the Government to trace to Defendants the proceeds of a specified unlawful activity – as alleged, the US$1 96 million from the Russian tax refund fraud   The Government, in conclusory fashion,

# Add. 27

alleges that the US$1 96 million deposited in the Prevezon 8160 Account were tainted funds but fails to provide any reasonable basis for that conclusion given that the Amended Verified Complaint identifies US$19 5 million (Rubles equivalent) of untainted funds that were transferred out of the Bank Krainiy Sever Account at the same time   This omission is fatal to the Government's claims

While the Government need not establish money laundering at this stage, it must at minimum "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial "  *See* 18 U S C  §§ 981(a)(l)(A), 1956(a), 1957; Supp R  G(2)(f)   The Government may not simply rely upon conclusory allegations to establish that the funds are traceable to a money laundering transaction   *See, e.g., $1,399,313.74 In United States Currency*, 591 F  Supp  2d, 365 at 376 (S D N Y  2008) (the Government "cannot premise forfeiture based simply on conclusory allegations "); *One United States v. White Crystal Covered Bad Tour Glove & Other Michael Jackson Memorabilia*, No  11-3582, 2012 WL 8455336, at *3 (C D  Cal  Apr  12, 2012) (complaint failed to "plead sufficient facts to support a reasonable belief that such ill-gotten gains were involved in some way with the Defendant Assets")   Rather, the allegations must be based on facts showing the receipt of tainted funds   *See, e.g., United States v. Certain Accounts, Together With All Monies On Deposit Therein*, 795 F  Supp  391, 398-99 (S D  Fla  1992); *United States v. Contents in Account No. 059-644190-69*, 253 F  Supp  2d 789, 795-967 (D  Vt  2003)

"If the tracing requirement in § 981 is to be given any effect − as, indeed, it must − then the Government is required to demonstrate something more than the fact of commingling, even across a series of complicated transactions, to establish that legitimate money is forfeitable by virtue of its commingling with tainted funds "  *Contents of Accounts Nos in Account No. 059-*

Add. 28

*644190-69*, 253 F  Supp  2d at 799-800   The Government cannot rely on the argument that the funds moved toward Defendants in a "pattern" suggestive of money laundering in order to establish that Defendants received tainted funds   *See United States v. All Right, Title and Interest in Real Property and Appurtenances Thereto Known as 785 St. Nicholas Ave. and 789 St. Nicholas Ave.*, 983 F 2d 396, 405 (2d Cir  1993) ("[T]he connection must be supported by proof amounting to more than 'mere suspicion '" (citation and marks omitted))

In *Banco Cafetero Panama*, the Second Circuit found: "[I]f such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, *but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed* "  797 F 2d 1154 (2d Cir  1986) (emphasis added)   Since *Banco Cafetero Panama*, Congress has enacted CAFRA which has increased the Government's pleading burden   *See* Supp  R  G   However, even the Second Circuit's extended discussion of various accounting methodologies in *Banco Cafetero Panama* demonstrates that tainted funds can only be traced if there is a fulsome record of all of the account transactions, including account balances, withdrawals, transfers, and deposits   Here, the Government has even admitted it does not have records to conduct a proper accounting   Gov't Dep  66:3–14, 81:4–9, 92:23–93:8   And the Amended Complaint acknowledges that some of the records have been destroyed   Am  Compl  ¶ 82

The Amended Complaint provides no reasonable basis for concluding that the US$1 96 million received by the Defendants was tainted   In February 2008, the Prevezon 8160 Account at UBS Bank in Zurich (not to be confused with USB in Russia) received transfers of $410,000 and $447,354 from two Moldavian companies named Bunicon and SC Elenast-Com SRL

22

Add. 29

("Elenast"), respectively ("February 2008 Transfers")   Am  Compl  ¶¶ 11 101-102 and Ex  B
The Amended Verified Complaint does not allege funds were directed by the Organization to
Defendants, but instead, identifies 24 transfers over eighty-seven (87) days into an account at a
major Russian Bank, Alfa Bank, in the name of Bank Krainiy Sever  *Id.* ¶ 190 and & Ex  B
The Amended Verified Complaint does not specify which customers of Bank Krainiy Sever
received the transfers or directed the transfers to Bunicon and Elenast, or even whether they were
the same or different customers   Exhibit B acknowledges that the Bank Krainiy Sever Account
transferred at least 487 6 million rubles in non-Treasury (and thus non-tainted) funds (which
equates to US$19 5 million) in the account when it made transfers totaling 1,185 billion Rubles
to Bunicon and Elenast  *See id.* at Ex  B   The Amended Verified Complaint never explains how
the Government can associate the US$1 96 that was transferred into the Prevezon 8160 Account
with Russian stolen funds, rather than the US$19 5 million in untainted non-Treasury funds
shown on the Government's chart



23

Add. 30

Between February 28 and March 20, 2008, the Prevezon 8160 Account allegedly received − in addition to the $857,354 from Bunicon and Elenast − an additional US$1,108,090 55 through seven (7) transfers from an unknown bank account belonging to an unknown company referred to in the Amended Verified Complaint as simply "Company-1" ("February-March 1980 Transfers") *Id.* ¶ 117   The Government does not name the company and the bank account from which these funds were transferred to the 8160 Account   Similar to the transfers from Bunicon and Elenast, the Government fails to describe a basis for alleging that US$1 1 million in Russian funds were transferred into the Prevezon 8160 Account from tainted funds rather than from the US$19 5 million in untainted funds contained in the Bank Krainiy Sever Account − an account that itself appears to be a bank's omnibus account, which by definition would contain funds with "a merely incidental or fortuitous connection to illegal activity " *Marine Midland Bank, N.A. v. United States*, 93-0307, 1993 WL 158542, at *7 (S D N Y  May 11, 1993) (citation and marks omitted)



At most, the Amended Verified Complaint establishes commingling of tainted and non-tainted funds through a series of transactions, but not that tainted funds ever reached Defendants The Government, thus, does not trace any funds from the Russian fraud into the Prevezon 8160 Account, a fundamental fallacy in its case   The need for a flawed tracing further highlights the Government's failure to allege facts rebutting Mr  Katsyv's explanation that the company received investor funds prior to his purchase of the company   The Amended Verified Complaint, thus, must be dismissed

**D.     THE GOVERNMENT FAILS TO ALLEGE THAT DEFENDANTS LAUNDERED ANY FUNDS THEY RECEIVED**

The Amended Verified Complaint seeks to forfeit properties of the Prevezon Defendants and impose monetary penalties equivalent to the entire US$230 million Russian fraud on the basis that Defendants engaged in money laundering   Am  Compl  ¶¶ 137-71   To make these Claims, the Government must allege not only that Defendants received tainted funds, but also that Defendants then laundered those funds by engaging in monetary transactions with the intent to promote an SUA or to conceal the nature of SUA proceeds   *See* 18 U S C  §§ 981(a)(1)(A), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2)(A), 1956(a)(2)(B), 1956(h), 1957(a); *United States v. Gotti*, 459 F 3d 296, 334 (2d Cir  2006)   The Government's theory fails because the Amended Verified Complaint does not adequately allege that: (1) Defendants invested any tainted funds in New York real estate; (2) Defendants had the requisite knowledge or intent to commit money laundering; or (3) Defendants' properties had a "substantial connection" to the Russian income tax refund fraud [19]

**1.     The Government Has Not Demonstrated that Tainted Funds Were Invested in New York Real Estate**

**a.     The Government Tracing Fails to Identify Any Tainted Funds That Went Into the New York Properties**

Exhibit B to the Amended Verified Complaint stops tracing funds once they reach the Prevezon 8160 Account   It does not trace tainted funds to the Prevezon properties in the United States   *See* Am  Compl  Ex  B

The Amended Verified Complaint concedes that in May and June of 2008, Prevezon Holdings converted "millions of dollars into euros," which were then transferred to another

---

[19] *See* David B  Smith, Prosecution & Defense of Forfeiture Cases § 915 01[1][c] n 36 (2013) (observing that "the government frequently ignores the law and seeks forfeiture of the entire account with no factual or legal basis for its position," and that "[t]his has become one of the most common abuses of the money laundering forfeiture provisions")

Prevezon Holdings account at UBS – the euro-denominated Prevezon 8170 account   Am Compl ¶ 103   From there, the 8170 account "transferred over 3 million euros to AFI Europe, N V ," which used those funds to acquire a 30% interest in Dutch companies that held interests in "German partnerships holding property in Germany "  *Id.* The Amended Verified Complaint contains no allegations regarding any specific transfers of these funds from AFI Europe back to Defendants   There is one vague allegation that the funds in the Prevezon 8160 Account, which were used to purchase a piece of property in New York, included funds from AFI Europe  *Id.* ¶ 125   This allegation, which includes neither a date nor an amount, does not challenge the fact, urged by the United States to the Dutch court, that the US$1 96 million never left Europe  *Iqbal*, 556 U S  at 678   In fact, the Amended Verified Complaint fails to allege, even in conclusory fashion or otherwise, that the funds transferred from AFI Europe to the Prevezon 8170 Account included tainted funds   There is therefore no allegation whatsoever that tainted funds came to the United States

As the Amended Verified Complaint acknowledges, the Prevezon Defendants' purchases of New York real estate were separated in time by eighteen months to four years from the date of the Dutch investment and were conducted with other, untainted funds  *Id.* ¶¶ 125-130   Between November 2009 and September 2012, Prevezon Holdings purchased eight commercial and residential properties  *Id*   Six of the properties were purchased with funds from the Prevezon 8160 Account; two properties (purchased by Prevezon Soho and Prevezon Alexander) were purchased with funds from other unrelated or unspecified accounts  *Id.* ¶¶ 127, 130

The Government's case is built entirely on the idea that once allegedly tainted funds went into the Prevezon 8160 Account, all funds coming out of that account were somehow tainted This theory contradicts settled case law  *See Banco Cafetero Panama*, 797 F 2d at 1159-60

"[T]he presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85,* 969 F 2d 474, 476 (7th Cir  1992)  "Innocent funds are not forfeitable simply because they have been commingled with tainted funds," and the Government must "demonstrate something more than the mere fact of commingling." *Contents in Account No. 059-644190-69,* 253 F  Supp  2d at 799-800; *United States v. Nicolo,* 597 F  Supp  2d 342, 352, 357 (W D N Y  2009)

The Government was able to freeze the money in the Netherlands because the allegedly tainted funds never left the Netherlands   Am  Compl  ¶¶ 103, 136   The Government has, nevertheless, brought this case and frozen US$15 million in Defendants' properties without showing any tainted funds were used to purchase those properties or were otherwise involved in money laundering

### b. The Government Does Not Allege the Source of the Funds to Defendants Prevezon Soho or Prevezon Alexander

Even the Government's one vague allegation that AFI Europe transferred an unspecified amount to the Prevezon 8170 Account does not explain the seizure of assets of Prevezon Alexander and Prevezon Soho  Am  Compl  ¶ 125   With respect to Prevezon Alexander, the Amended Verified Complaint alleges only that it purchased 250 East 49th Street, Unit Comm3, for approximately US$6 25 million, on September 13, 2012  Am  Compl  ¶ 130   The Amended Verified Complaint does not identify the source of the funds used to make this purchase, much less trace those funds to the allegedly tainted funds   *See id.*  The same is true of Prevezon Soho; the Amended Verified Complaint alleges only that Prevezon Soho purchased property ("160 Wooster Street, Unit Com-1") for approximately US$6 286 million with funds from the Prevezon Holdings Marfin Account located in Cyprus.  *Id.* ¶ 127.  The Amended Verified

27

Add. 34

Complaint does not allege that the Marfin account received tainted funds or that any tainted funds were used in the purchase.  *Id*

### 2.  The Government Has Not Sufficiently Alleged Knowledge or Intent to Commit Money Laundering

The Amended Verified Complaint's meager 13 paragraphs regarding Defendants depict a very ordinary real estate investment operation; yet, the Government seeks to forfeit millions in Defendants' assets.  The Government admits that it knows little about Defendants' knowledge and intent, *see supra* Part II(B)(1), but nonetheless alleges that Defendants knowingly laundered tainted funds in violation of 18 U S C  §§ 1956 and 1957   *See* Dkt  No  58 at 23   The Government does not allege that Defendants were part of the Organization or even knew a single member of the Organization, knew about the Russian tax refund fraud, or knew Prevezon Holdings had received unlawful funds (rather than funds from an investor)   *See id.*  The Government, thus, must articulate how Defendants intended to promote the SUA of wire fraud, attempted to conceal or disguise the proceeds of the SUA, or knowingly engaged in transactions involving criminally derived property  18 U S C  §§ 1956(a)(1), 1957   The Government has not presented any factual allegations to support these offenses, let alone its allegation of conspiracy to commit them

To satisfy its statutory burden, the Government can point only to acts of third parties, not acts of Defendants   The Government purports to trace tainted funds from the Russian Treasury through multiple banks but does not allege that Defendants had anything to do with or knew about this flow of funds   The entries regarding sanitary equipment or automotive spare parts are the statement of a third party, a bank, and not attributed by the Government to Defendants   More puzzling still is how the Government intends to rely on a "supposed contract" and "supposed invoice" – submitted by third parties to third parties and "purportedly signed" by an unnamed

28

representative of Prevezon Holdings – to show Defendants' *scienter*   Am  Compl  ¶ 111   The Government does not allege that these documents were signed by anyone from Prevezon, let alone that the existence of the documents were known to Defendants   Instead, as with the original Verified Complaint, this new complaint contains nothing but allegations that people *other than Defendants* did things and knew things

Not only are those "suspicious facts" the alleged acts of third parties—Defendants are not alleged to have known those facts in the first place   The Government, apparently, hopes that this Court will overlook the obvious point that suspicious facts not known to the Defendants are irrelevant to their mental state and therefore that the complaint is silent on the key issue of Defendants' knowledge   *See, e.g.*, *Saltz v. First Frontier, L.P.*, 485 F  App'x 461, 465 (2d Cir 2012) (affirming dismissal because plaintiff failed to allege the defendant's awareness of alleged red flags); *Benzman v. Whitman*, 523 F 3d 119, 129 (2d Cir  2008) ("Although the complaint contains numerous allegations that various employees within EPA were aware of data indicating health risks, there is no allegation that Whitman, from whom damages are sought in her personal capacity, was herself aware of such information ")   The Government may point to the newly-added allegation concerning Israeli proceedings in which it was found that money laundering did not occur, Am  Compl  ¶ 113, but that allegation, as the Government itself argues, only establishes Mr  Katsyv's knowledge of money laundering laws in general—which, if sufficient to substantiate a charge of money laundering in this case, should put the entire subscriber lists of THE WALL STREET JOURNAL, THE NEW YORK TIMES, and FINANCIAL TIMES on red alert

Once the funds are in the Prevezon 8160 Account, the Government acknowledges that the funds were handled in a straightforward and transparent manner, like any other real estate company   Am  Compl  ¶¶ 101-103   After six years, the Government has not traced a single

29

dime from Defendants back to any member of the Organization   This omission is particularly important as the court in *United States v. Miles* said:

> The crime of money laundering promotion is aimed not at maintaining the legitimate aspects of a business nor at proscribing all expenditures of ill-gotten gains, but *only at transactions which funnel ill-gotten gains directly back into the criminal venture.* To hold otherwise would be to ignore *Brown's* warning that the money laundering statute is not a mere money spending statute

360 F 3d 472, 479 (5th Cir  2004) (citing *United States v. Brown*, 186 F 3d 661 (5th Cir 1999))

The Government has failed to present sufficient factual allegations to demonstrate that the Prevezon Defendants had the requisite *scienter* to be involved in money laundering liability   The Amended Verified Complaint, thus, must be dismissed

### 3.   The Government Has Not Shown a Substantial Connection Between Defendants and the Specified Unlawful Activity

The Government's claims fail for a third reason: neither Defendants nor their property were substantially connected to alleged wire fraud, which relates to the Russian tax refund fraud and the single wire transfer through New York   There must be a substantial connection between the property the Government seeks to forfeit and the underlying offense   18 U S C  § 983(c)(3); *In re 650 Fifth Ave. & Related Props.,* 777 F  Supp  2d at 558   The single wire transaction was totally unrelated to Defendants; the funds allegedly were in transit to a third party   Am  Compl  ¶¶ 97-98   And none of the funds from the Russian Treasury have been traced into the eight Prevezon Defendants in New York   Even the one unspecified transfer from AFI Europe into the Prevezon 8160 Account does not cause that account to have a substantial connection to the Russian theft when Prevezon Holdings made legitimate investments in New York real estate

By the Government's own accounting, two New York properties – Prevezon Soho and Prevezon Alexander – were not purchased with funds from the Prevezon 8160 Account and, thus, had no connection to the alleged tainted Treasury funds   Am  Compl  ¶¶ 125, 130   The

30

Add. 37

Case 1:13-cv-06326-TPG   Document 213   Filed 01/12/15   Page 37 of 39

Government simply deems them as culpable as any of the other Defendants   This is another case of Government overreaching, like *Wetterer*, in which the Second Circuit saw "aggressive but marginal claims asserted on dubious jurisdiction     " *Funds Held in the Name or for the Benefit of Wetterer,* 210 F 3d at 110

**E.     THE AMENDED VERIFIED COMPLAINT IS NOT PROPERLY VERIFIED AS REQUIRED BY SUPPLEMENTAL RULE G**

The Amended Verified Complaint was not properly verified as required by Supp  R G(2)(a), which governs forfeiture actions *in rem*, the First Claim in the Amended Verified Complaint   The Rule says unambiguously that "[t]he Complaint must be verified "  And not surprisingly, the Verification must be true both as to the facts of the complaint, and as to the sources of the information and the basis of belief that the facts are correct

The failure to submit a proper verification is a fatal defect   Where discovery shows that statements in a verified complaint are not supported by the evidence, the court may dismiss the complaint with prejudice   *See, e.g.*, *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Servs. N. Am. LLC,* No  03-760, 2006 WL 2808158, at *9-10 (N D  Ill  Sept  6, 2006) (dismissing complaint based on false statements that were unsupported); *see also United States v. One Tyrannosauraus Bataar Skeleton*, No  12-4760 (PKC), 2012 WL 3947563, at *1-2 (S D N Y  Sept  7, 2012) Discovery has shown that many of the allegations in the Amended Verified Complaint are not supported by any evidence or reasonable belief

The Amended Verified Complaint was verified by Todd Hyman, Special Agent for the Department of Homeland Security  Am  Compl  p  63   Agent Hyman swore: "that he has read the foregoing Verified Complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief "  *Id.*  However, when Agent Hyman testified on behalf of the United States, his testimony directly contradicted his verification   *See ante* II(B)

31

His testimony demonstrated that he did not have a basis to state that the complaint was true to the "best of his knowledge, information and belief "

The Verification goes on to say that "[t]he sources of deponent's information and the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials and representatives " *Id.* That statement is highly misleading   It entirely omitted the affiant's complete reliance on William Browder   What Agent Hyman did not say in the Verification was that he spoke with William Browder, read documents provided by William Browder, examined the contents of a website maintained by Browder, conducted no further investigation, and verified the Complaint as though it were the result of a thorough Government-run investigation   Agent Hyman did not say "I have spoken to no competent witnesses, I have no admissible bank records, and the money tracing is based on a series of assumptions without authentic records " But that is what he said, in substance, when being deposed   This is the type of "deception" that "so taint[s] the litigation that the very allegations set forth in the Complaint can not be trusted as being valid " *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158, at *8

Defendants' Due Process protection for the seizure of any and all of their properties under 18 U S C  983(j) comes from the verification of the AmendedVerified Complaint   *See United States v. Contents of Accounts*, No  3:10-cv-228-H, 2010 WL 2556849, at *10 (W D  Ky  June 18, 2010); *United States v. Melrose East Subdivision*, 357 F 3d 493, 500 (5th Cir  2004) (recognizing that due process may require post-deprivation hearing); *United States v. Contents of Accounts*, 629 F 3d 601, 609 (6th Cir  2011) (same)

Add. 39

Claim one, the forfeiture count, specifically requires a proper verification   The Amended

Verified Complaint was not properly verified and, therefore, the forfeiture count must be

dismissed for lack of a proper verification

**IV.     CONCLUSION**

For the foregoing reasons, the Amended Verified Complaint must be dismissed with

prejudice

Dated:  January 12, 2015
        New York, New York

Respectfully Submitted,

/s/ Mark A  Cymrot                                    Seth T  Taube
Mark A  Cymrot                                        Richard B  Harper
BAKER & HOSTETLER LLP                                 BAKER BOTTS L L P
Washington Square, Suite 1100                         30 Rockefeller Plaza
1050 Connecticut Ave ,                                New York, NY 10112
Washington, D C  20036                                Telephone: (212) 408-2500
Telephone: (202) 861-1677                             Facsimile: (212) 408-2501
Facsimile: (202) 861-1783                             seth taube@bakerbotts com

John W  Moscow
Loura L  Alaverdi
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
jmoscow@bakerlaw com

*Attorneys for Defendants*